**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2002-CA-00669-SCT**

*WALTER W. ECKMAN, M.D. AND AURORA SPINE*
*CENTERS-MISSISSIPPI, INC.*

*v.*

*LINDA MICHELLE MOORE, INDIVIDUALLY, AND*
*FOR AND ON BEHALF OF THE WRONGFUL DEATH*
*BENEFICIARIES OF JASON TAYLOR MOORE,*
*DECEASED*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 03/04/2002 |
| TRIAL JUDGE: | HON. RICHARD D. BOWEN |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROBERT K. UPCHURCH |
| | DAVID W. UPCHURCH |
| | JOSIAH DENNIS COLEMAN |
| ATTORNEYS FOR APPELLEES: | BOBBY L. DALLAS |
| | BRAD SESSUMS |
| | WALTER C. MORRISON, IV |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 03/25/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is granted. The original opinions are withdrawn, and these opinions are

substituted therefor.[1]

---

[1]While we grant the motion for rehearing, by order handed down this day in conjunction with this
opinion, we have found certain parties and counsel in violation of M.R.A.P. 40(c) which provides for the
striking of any language which is disrespectful toward either appellate court. This Rule further provides for

**STATEMENT OF THE CASE**

¶2.    This is a wrongful death case involving the medical treatment provided to Jason Taylor Moore (Taylor) by Dr. Walter W. Eckman (Dr. Eckman), the Aurora Spine Centers-Mississippi, Inc. (Aurora), and North Mississippi Medical Center (NMMC).

¶3.    On the evening of February 20, 1999, Taylor fell in a movie theater, sustaining a head injury in the fall. He then went to NMMC for treatment by the on-call physician, Dr. Eckman. On March 20, 2000, Linda Michelle Moore (Michelle), Taylor's wife, filed suit against Dr. Eckman, Aurora and NMMC both individually and as the conservator of the estate of Taylor in the Circuit Court of Lee County. The complaint alleged personal injury to Taylor and Michelle in connection to the treatment provided to Taylor. On May 19, 2000, Taylor died; thus on August 24, 2000, an amended complaint was filed on behalf of Michelle and the wrongful death beneficiaries of Taylor for alleged negligence resulting in the death of Taylor.

¶4.    On February 12-26, 2002, a trial was conducted, and the jury returned a verdict in favor of Michelle and the wrongful death beneficiaries of Taylor for $5 million. The jury determined that Dr. Eckman and Aurora were 60% liable and NMMC was 40% liable. On March 4, 2002, a final judgment was entered by the trial court. Dr. Eckman and Aurora filed a motion for judgment notwithstanding the verdict, or, in the alternative, a motion for new trial. The trial court denied the motion without a hearing. Dr. Eckman and Aurora timely filed their appeal to this Court. Finding reversible error, we reverse the judgment of the Circuit Court of Lee County and remand this case for a new trial.

**FACTS**

appropriate action by the appellate court.  While zealous advocacy is appropriate and certainly encouraged, expressed disrespect or contempt for either appellate court by any party dissatisfied with an appellate court decision is absolutely sanctionable and will not be tolerated in the future.

¶5.     On February 20, 1999, while at the movies, Taylor went to the bathroom and apparently slipped or fell and struck his head. He wandered out of the theater and drove away in his car. Michelle, Taylor's wife, could not find him and called him on his cell phone. Taylor seemed confused, but she eventually directed Taylor to the emergency room. Dr. Peters, an emergency room doctor, ordered a computer tomography, a.k.a. CT or cat scan, to be performed on Taylor. The CT scan showed some bleeding in the frontal lobe. Neurological checks and vital signs were ordered every two hours.

¶6.     At approximately 2:00 p.m. on February 21, 1999, Taylor began to complain of nausea and headaches even though his pain medication had been increased. Dr. Carl Hauser, Michelle's expert witness, testified that both these complaints along with increased blood pressure were significant. Taylor had been diagnosed with hypertension a few years before and took medication for the condition. At 6:00 p.m. his blood pressure was 150/98, and at 170/110 two hours later. The nurses informed Dr. Eckman about the increased blood pressure, and Dr. Eckman directed the nurses to give Taylor his blood pressure medicine.

¶7.     Taylor was given Monopril, his usual blood pressure medicine, just before 7:00 p.m. Instead of lowering his blood pressure, the medical records indicated that his blood pressure increased. By 8 p.m. Taylor's blood pressure was 170/110, and two hours later it was 172/124. The records indicated that around 10:30 p.m. the nurses notified Dr. Eckman that Taylor had what he described as the worst headache that he had ever had and of Taylor's increased blood pressure. Dr. Eckman ordered that Talwin and Codeine be given alternately.

¶8.     Dr. Eckman stated that he requested that the emergency room physician admit Taylor to the hospital about 2:00 a.m. and to make a written request for the neurological checks on him. Dr. Eckman

then saw Taylor about 7:00 or 8:00 a.m that same morning. During the visit Dr. Eckman collected Taylor's medical history, performed a general physical exam, and a detailed neurological exam. Other than suffering from a headache, Taylor appeared to be in normal condition. The next time that Dr. Eckman saw Taylor was after his cardiac arrest. Prior to the arrest, Dr. Eckman had a few telephone conversations with the hospital staff about Taylor's condition. Dr. Eckman stated that prior to the arrest, he had not heard from the nursing staff since about 10:00 to 10:30 p.m. the previous night.

¶9.     On cross-examination Dr. Hauser stated that from Taylor's initial admission at 11:00 p.m. Saturday night to 10:00 p.m. Sunday, there was no decline in his Glasgow Coma Score or his neurological status. A normal neurological check includes waking a patient from sleep and checking their level of consciousness, pupils, speech, orientation to person, place and time, and strength. Dr. Hauser opined that the nursing staff performed appropriate neurological assessments from Taylor's presentation to the emergency room at 10:30 p.m. on February 20 through approximately 10:30 p.m. on February 21. Dr. Hauser stated that there were no documented neurological checks performed by the nursing staff between 10:00 p.m. and 6:00 a.m. (February 21-22) that sufficiently complied with the standard of care for nurses. Dr. Hauser stated that had the neurological checks been adequately performed by the nursing staff then Taylor's changes would have been discovered, the doctor could have been called and provided surgical care, the arrest and brain damage would have been avoided, and his death would have been prevented as well. The hematoma accumulated over a 30-hour period.

¶10.     When Dr. Eckman was contacted by the staff, he gave no orders for surgery but, ordered a CT scan. Around noon, an angiogram was ordered, and it indicated that the blood supply to the brain was intact. An operation was subsequently performed on February 23, 1999.

4

## DISCUSSION

**I. WHETHER THE TRIAL COURT ERRED BY DENYING THE SUPERSEDING CAUSE JURY INSTRUCTION (D1-12) REQUESTED BY DR. ECKMAN.**

¶11. It is well-established law that a defendant is entitled to have the jury instructed on his theory of the case. *Coho Resources, Inc. v. McCarthy*, 829 So.2d 1, 23 (Miss. 2002) (citing *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998)). However, a court may refuse a jury instruction which "incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence." *Id.* This Court will not reverse the verdict of the jury if that jury was fully and fairly instructed by the other instructions. *Id.*

¶12. Dr. Eckman's proposed jury instruction on superseding cause, DI-12, read as follows:

> A superseding cause is an independent and unforseen act by a third person which follows the Defendant's negligence, if any you should find, and which is the substantial factor in causing the injuries alleged by the Plaintiff. A superseding cause becomes the proximate cause for the Plaintiff's alleged injuries and the Defendant's negligence is a remote cause for which he is not liable. Thus, if you find from a preponderance of the evidence in this cause that Dr. Eckman was negligent in his care and treatment of Taylor Moore on February 21, 1999, but that an independent and unforseen act by a third person, namely the alleged failure of nursing personnel at the North Mississippi Medical Center to meet the standard of care with respect to the nursing care provided to Moore on February 21 and 22, 1999, followed Dr. Eckman's negligence, if any, and was a substantial factor in causing Mr. Moore's neurological injuries and subsequent death, then Dr. Eckman is not liable for the injuries proximately resulting from the superseding cause, and your verdict shall be for the Defendants, Dr. Eckman and Aurora Spine Centers-Mississippi, Inc.

Counsel for Michelle objected to this instruction stating that superseding cause was not at issue; therefore, the trial judge refused this instruction which properly stated the law of superseding cause. However, counsel for Dr. Eckman, responding for the record, stated:

MR. D. UPCHURCH: We would urge, certainly recognize the Court's ruling on that, but for the record would state that on behalf of Dr. Eckman, we think that is an appropriate instruction and, *in particular given the testimony of Dr. Carl Hauser with regard to the alleged deviations from the standard of care from nursing personnel* on -- on the -- on February 21, 1999, and into the early morning hours of February 22nd, 1999. And given the -- the case that Dr. Hauser set out against the hospital we believe that would be a proper instruction.

(emphasis added).

¶13.    Dr. Eckman argues that the superseding cause issue revolves around the neurological checks which were to be performed by the nursing personnel at NMMC. Dr. Eckman testified that when he admitted Taylor to the hospital, he ordered the nursing personnel to perform neurological checks on Taylor every two hours. Michelle's expert, Carl Hauser, M.D., testified that Dr. Eckman's order was appropriate, and Michelle's neurological expert, Horace Norell, M.D., agreed with Dr. Hauser's assessment. Michelle further put on proof that the nursing personnel at NMMC failed to perform appropriately those neurological checks on Taylor as ordered by Dr. Eckman.

¶14.    Although Michelle offered evidence that the nursing personnel at NMMC was negligent in their treatment of her husband, Michelle contends that Dr. Eckman was negligent before, during and after any negligence by the nursing personnel. Michelle argues Dr. Eckman was negligent in failing to respond to calls made to him by the nursing personnel regarding Taylor. However, Dr. Eckman testified that the last phone call he received was at 10:30 p.m. on the night of February 21, 1999, wherein the nursing personnel informed him that Taylor's neurological status was normal. He was not contacted again until 6:00 a.m. on February 22, 1999. During that seven and one-half hour time lapse, the nursing personnel, upon orders by

6

Dr. Eckman, should have performed at least four other neurological checks on Taylor, but, according to the testimony of Michelle's own expert witnesses, they failed to do so.

¶15. Although the superseding cause instruction was not granted by the trial judge, other jury instructions regarding nursing personnel failing to follow the proper standard of care were given. Jury Instruction No. 29, offered by plaintiff, read:

> If you find from a preponderance of the evidence in this case that the nursing personnel providing medical care and treatment to Jason Taylor Moore on February 21 and 22, 1999, failed to properly monitor, assess, and take action as his medical condition required; that this failure, if any, constituted negligence, as that term is defined elsewhere in these instructions; and that *that negligence, if any, proximately cause or contributed to cause injury to and the eventual death to Jason Taylor Moore*, then you should return a verdict in favor of the Moore Family against North Mississippi Medical Center, and assess their damages.

(emphasis added). Jury Instruction No. 30, also offered by plaintiff, read:

> If you find from a preponderance of the evidence in this case that the nursing personnel at North Mississippi Medical Center failed to conduct appropriate neurological checks on Jason Taylor Moore during the early morning hours on February 22, 1999, *as ordered by Dr. Eckman*; that the failure of the nurses to perform appropriate neurological checks constituted negligence as that term is defined elsewhere in these instructions; and that *this negligence, if any, proximately caused, or contributed to cause, injury or damage to Mr. Moore and his eventual death*, then you should return a verdict in favor of the Moore Family against North Mississippi Medical Center.

(emphasis added). However, these two jury instructions, along with the other instructions given to the jury, did not properly instruct the jury as to Dr. Eckman's theory of the case regarding superseding cause.

¶16. Pursuant to Jury Instruction No. 32, which was an interrogatory instruction, the jury found NMMC to be negligent in a manner which proximately caused or contributed to the injury and death of Taylor Moore and found NMMC to be forty percent (40%) at fault. Therefore, it is clear that the jury found that

the nursing personnel negligently performed their duties, such as conducting proper neurological checks as ordered by Dr. Eckman, thus the superseding cause instruction was within the bounds of the evidence presented at the trial.

¶17.	[T]his Court has stated:

> [T]hat negligence which merely furnished the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof.
>
> *Robison v. McDowell*, 247 So.2d 686, 688 (Miss. 1971). *See also*, *Hoke v. Holcombe*, 186 So.2d 474, 477 (Miss. 1966); *Mississippi City Lines, Inc. v. Bullock*, 194 Miss. 630, 640, 13 So.2d 34, 36 (1943).
>
> However, if an *antecedent negligent act puts in motion* an agency which continues in operation until an injury occurs it would appear to be more like a second proximate cause than a remote and unactionable cause.

*Blackmon v. Payne*, 510 So.2d 483, 487 (Miss. 1987) (emphasis added).

¶18.	In *Mississippi City Lines v. Bullock*, 194 Miss. 630, 639, 13 So.2d 34, 36 (1943), this Court stated:

> Although one may be negligent, yet if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a non-actionable cause. Negligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof. The question is, did the facts constitute a succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the alleged wrong and the injury?

*See also* *Touche Ross & Co. v. Commercial Union Ins. Co.*, 514 So.2d 315, 323-24 (Miss. 1987); *Saucier v. Walker*, 203 So.2d 299, 305 (Miss. 1967); *Hoke v. W.L. Holcomb & Assocs., Inc.*, 186 So.2d 474, 477 (Miss. 1966).

8

¶19. Both Dr. Eckman and plaintiff presented evidence that the negligence of the nursing personnel of NMMC contributed to the death of Taylor Moore. The jury must be instructed on all material issues presented in evidence. Therefore, the trial court erred in refusing Dr. Eckman's superseding cause instruction and, thus, denied Dr. Eckman his right to have his theory of the case properly presented to the jury.

## II. WHETHER THE TRIAL COURT ERRED BY ADMITTING PHOTOGRAPHS AND TWO DAY IN THE LIFE VIDEOS.

¶20. The admission of photographs and motion pictures is a matter for the sound discretion of the trial court, and that court is afforded wide latitude in exercising this discretion. *Niles v. Sanders*, 218 So.2d 428, 432 (Miss. 1969); *Marr v. Nichols*, 208 So.2d 770, 773 (Miss. 1968). *See also Butler v. Chrestman*, 264 So.2d 812, 816 (Miss. 1972).

¶21. Day-in-the-life videos are used in "personal injury and medical malpractice cases to demonstrate to the jury the daily activities of the plaintiff, specific limitations that the plaintiff encounters, or the plaintiff's physical treatment or therapy." Jane A. Kalinski, *Jurors at the Movies: Day-in-the-Life Videos as Effective Evidentiary Tool or Unfairly Prejudicial Device?*, 27 Suffolk U.L. Rev. 789, 796 (1993). "     In its purest form, a D[ay-]I[n-the-]L[ife] video will begin as the injured

    party awakens and continues until he/she has gone to sleep. In actuality,

    a D[ay-]I[n-the-]L[ife] video presented in court consists of approximately

    fifteen to twenty minutes of edited tape which portrays limited segments

    of daily activities."  J. Ric Gass, *Defending against Day In the Life*

    *Videos*, 432 PLI/Lit 143, 148 (1992).

¶22. In *Butler*, an 8 mm movie film which "depicted an agonizing period during (the plaintiff's) recovery" was viewed by the jury as evidence of her pain and suffering. This Court reversed and remanded the case, holding that:

> Where the only purpose of photographs is to influence and prejudice the jury they should be excluded, but *where they visualize the injury at a stage subsequent to the accident*, they may not be excluded solely because they may contain emotional overtones. ***Jensen v. South Adams County Water and Sanitation District***, 149 Colo. 102, 368 P.2d 209 (1962), and ***Godvig v. Lopez***, 185 Ore. 301, 202 P.2d 935 (1949) .
>
> Caution again is stated to trial judges to preview such evidence to determine its probative value as against its prejudicial effects upon a jury.

*Butler*, 264 So. 2d at 816 (emphasis added). In ***Trapp v. Cayson***, 471 So.2d 375, 380 (Miss. 1985), after determining the video had probative value and would be of assistance to the jury, the trial judge allowed a one hour and twenty minute video to be viewed by the jury.

> The film depicted various activities of Cayson, such as waking up and moving from bed to wheelchair, attaching a catheter apparatus for urination, bowel evacuation procedures in the bathroom, taking a shower, dressing, eating breakfast, brushing teeth and shaving, exercising in a 'stand-up', opening mail with his teeth, moving about the house and kitchen, driving a van, emptying a legon of urine, getting undressed and going to bed. The narration of the film by Cayson consisted of explaining what he was doing in the film.

*Id.* at 381. In ***Jesco, Inc. v. Shannon***, 451 So.2d 694 (Miss. 1984), the jury was allowed to watch a film of normal burn treatment procedures which was substantially the same treatment received by Shannon. This Court upheld the trial court's ruling finding no abuse of discretion. *Id.* at 702.

¶23. Courts of other jurisdictions have dealt with the issue of the prejudicial nature of day-in-the-life videos and have frequently admitted them into evidence. In ***Grimes v. Employers Mutual Liability Ins. Co.***, 73 F.R.D. 607 (D. Alaska 1977), Thomas I. Grimes, who was injured in an industrial accident,

10

attempted to admit a film depicting himself performing several daily activities and conducting clinical tests.

The film also contained scenes of Grimes at home with his daughter and quadriplegic brother, who were

not parties to the lawsuit. Employers Mutual objected to the admissibility of the tape on several grounds

including the tape was irrelevant, unduly prejudicial, and cumulative. The court held:

> *The scenes of the plaintiff with his daughter and with his quadriplegic brother serve little purpose other than to create sympathy for the plaintiff.* The prejudicial effect of these scenes outweighs the probative value of the evidence. In contrast, the other scenes of the plaintiff performing daily functions and the film of the plaintiff *performing clinical tests* have a probative value greater than any prejudice which might result. The films illustrate better than words, the impact the injury had on the plaintiff's life in terms of pain and suffering and loss of enjoyment of life.

*Id.* at 610 (emphasis added).

¶24.    In *Jones v. City of Los Angeles*, 20 Cal.App.4th 436, 442, 24 Cal. Rptr. 2d 528 (Cal. Ct.

App. 1993), the trial court found that the day-in-the-life video sought to be introduced by Jones was

"relevant and material to Jones's medical treatment and to an understanding of her daily life." The court of

appeal affirmed the judgment of the trial court holding:

> The videotape was relevant on the issue of damages. The videotape was highly probative of the extent of Ms. Jones's injuries and graphically demonstrated her need for constant medical attention in a manner oral testimony could not convey. It also had substantial probative value on the extent of Ms. Jones's pain and suffering and was therefore helpful to the jury in calculating appropriate damages.

*Id.* at 442.

¶25.    In *Bannister v. Town of Noble, Okl.* 812 F.2d 1265 (10th Cir. 1987), Bannister, who  was

rendered a paraplegic due to injuries sustained in an automobile accident, introduced a day-in-the-life video

to show how he had adapted to his injury and how his paraplegia had affected his everyday life. In its

analysis concerning the admissibility of the videotape, the court outlined a number of issues a trial judge should consider prior to admitting such a film.

¶26.    The court first stated the day-in-the-life video must "fairly represent[] the facts with respect to the impact of the injuries on the plaintiff's day-to-day activities." *Id.* at 1269 (citing *Bolstridge v. Cent. Me. Power Co.*, 621 F. Supp. 1202, 1203 (D. Me. 1985)). A typical day-in-the-life video would not depict a victim performing improbable tasks. *Bannister*, 812 F.2d at 1269.  In order for the video to have the least amount of prejudicial value, the video must portray ordinary, day-to-day situations. *Id.*

¶27.    Secondly, the court found that if "'a plaintiff is aware of being videotaped for [the purpose of litigation, it] is likely to cause self-serving behavior, consciously or otherwise.'"*Id.* (quoting *Bolstridge*, 621 F. Supp. at 1203 (citing *Haley v. Byers Transp. Co.*, 414 S.W.2d 777, 780 (Mo. 1967))). Although this is inevitable to some extent, the court cautioned against the admission of such evidence. *Bannister*, 812 F.2d at 1269.

¶28.    Next, the court determined that "a jury will better remember, and thus give greater weight to, evidence presented in a film as opposed to more conventionally elicited testimony." *Id.* The court again cautioned other courts in recognizing this legitimate concern when determining the prejudicial effect of a day-in-the-life video. *Id.*

¶29.    Finally, the court stated that effective cross-examination is lost with day-in-the-life videos. *Id.* This concern could be lessened if the victim could be cross-examined at trial regarding the film; however, the possibility that a film will be prejudicial is significantly increased when the subject of that film can not be cross-examined at trial. *Id.* at 1269-70.

12

¶30. The above-cited cases where this Court and courts in other jurisdictions affirmed the admissibility of day-in-the-life videos are all similar in that they truly depicted scenes from a "day in the life" of the victim. The videos allowed the trier of fact to see how the victim's life had been changed by their injuries. However, due to their extreme prejudicial nature, the majority of the photographs and scenes from the videos admitted by the trial court in the case sub judice fall in the same category of those cases reversed and remanded for new trials.

¶31. Of course, in finding error in the admissibility of certain photographs and videos in today's case, we also filter these evidentiary issues through Miss. R. Evid. 403 which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We have held that the admission of evidence is well within the sound discretion of the trial court, subject to reversal on appeal only if there be an abuse of that discretion. *Ill. Cent. R.R. v. Gandy*, 750 So.2d 527, 531 (Miss. 1999) (citing *Miss. Transp. Comm'n v. Fires*, 693 So.2d 917, 920 (Miss. 1997); *Terrain Enters., Inc. v. Mockbee*, 654 So.2d 1122, 1128 (Miss. 1995)). Prior to the judicial enactment of our Mississippi Rules of Evidence, which took effect on January 1, 1986, we relied on our numerous cases to determine the admissibility of evidence. The resulting codification still left intact the long-standing abuse of discretion standard for appellate review of a trial court's decision concerning the admissibility of evidence.

¶32. Demonstrative evidence has evolved from still photographs, to films, color slides, videotapes, and computer-generated demonstrations. However, the standard is the same. The trial judge must exercise

sound discretion in determining whether the proffered evidence is relevant under Miss. R. Evid. 401 and even if relevant, whether such relevant evidence is admissible applying the Miss. R. Evid. 403 criteria. Our learned trial judges are the gatekeepers, not only in determining the admissibility of expert testimony under Miss. R. Evid. 702, but also in fairly determining the admissibility of all proffered evidence both under the Mississippi Rules of Evidence and the subsequent case law interpreting these Rules.

¶33.    In the present case, Michelle was allowed to introduce two day-in-the-life videos. The first video, which was shown during Michelle's testimony, depicts still wedding pictures and pictures of Taylor's stepson, who is not a party to this lawsuit, at a graduation ceremony and a ball game. While the wedding pictures may be admissible to show Taylor  as he was before his injury, the proper place for these pictures is not in a "day in the life" video of Taylor Moore. These wedding pictures were also admitted in picture form.  As stated in *Grimes*, the scenes of Taylor's stepson, who is not a party to the lawsuit, serve no other purpose than to elicit sympathy from the jury. These scenes are also not relevant to a "day in the in the life" of Taylor Moore and should be deleted from the video. However, the video also depicts Taylor engaged in physical therapy, Taylor being washed, clothed and fed by staff, and Taylor being visited by his wife and newborn son. These are the typical scenes which are found, and which should be found in day-in-the-life videos. If the wedding pictures and the pictures featuring Taylor's stepson were deleted, this video would be admissible.

¶34.    The second video again shows Taylor in the rehabilitation center. However, in this video, Taylor's mother, who is also not a party to this lawsuit, is heard sobbing over her son "Momma loves you, Momma loves you." This scene is highly prejudicial. Because the second video is cumulative of the first and contains highly prejudicial scenes, it should have been excluded by the trial judge.

14

¶35.    Reality reveals to us that, unfortunately, some day-in-the-life videos are no longer being used for their proper purposes but instead, are being introduced solely for the purpose of eliciting sympathy from the jury. While we admittedly cannot begin to fully comprehend the immense pain and suffering these families have had to endure, the proper purpose of the day-in-the-life video is to show an actual day in the life of the victim. By introducing the videos, Michelle attempted to show such scenes but then strayed from the true purpose by incorporating additional material which is neither relevant nor probative.

¶36.    While the trial court erred by admitting the two videos, we must also address the cumulative nature of the photographs which were admitted. In addition to the two day-in-the-life videos, Michelle was also allowed to introduce approximately seventy-five photographs. Among these photographs were photographs depicting Taylor in high school and identifying his high school activities, thirty-six photographs from Taylor and Michelle's wedding, fourteen miscellaneous family pictures, two photographs of Michelle in the hospital prior to giving birth, six photographs from Michelle's baby shower, which leaves only ten photographs of Taylor in the rehabilitation center. These ten photographs were still shots from the day-in-the-life videos.

¶37.    While we understand and appreciate the necessity of showing Taylor Moore as he was before his accident and the necessity in proving damages in a wrongful death suit in order for damages to be awarded, courts must take caution in admitting such a large number of photographs. We conclude that the thirty-six pictures admitted of the Moores' wedding are cumulative.  The high school photographs are too remote in time from the events giving rise to the instant case to have probative value. Although Michelle is required to prove damages, in this case loss of consortium, the photographs of Mrs. Moore at her baby shower and in the hospital prior to giving birth are more prejudicial than probative.  Therefore, upon remand, the first video should be admitted if the proper edits are made.  The second video will not be admitted as it is

cumulative of the first video and highly prejudicial. Also with regards to the pictures, the high school

pictures are inadmissible as are the baby shower pictures. As previously introduced, the wedding album

is cumulative and should not be admitted.

### III. WHETHER THE TRIAL COURT ERRED BY ALLOWING CLOSING ARGUMENT STATEMENTS.

¶38. The test in determining whether a lawyer has made an improper argument which requires reversal

is "whether the natural and probable effect of the improper argument. . . create[s] an unjust prejudice

against the [opposing party] result[ing] in a decision influenced by the prejudice so created." *Davis v.*

*State*, 530 So.2d 694, 701-02 (Miss. 1988). This Court further explained in *Clemons v. State*, 320

So.2d 368 (Miss. 1975), that:

> So long as counsel in his address to the jury keeps fairly within the evidence and the issues involved, wide latitude of discussion is allowed; but, when he departs entirely from the evidence in his argument, or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence, the trial judge should intervene to prevent an unfair argument.

*Id.* at 371. This Court has also established that:

> While an attorney making a closing argument may not make remarks which are unfairly calculated to arouse passion or prejudice, and while we do not condone appeals to sectional prejudices of the jury, the control of such argument is left largely to the discretion of the trial judge, who is in a much better position to observe and determine what is improper.

*James W. Sessums Timber Co. v. McDaniel*, 635 So.2d 875, 882 (Miss. 1994).

¶39. During closing argument, Michelle's counsel made the following remarks:

> MR. DALLAS: Tomorrow, Dr. Eckman will leave this courtroom or leave his house, and he'll go hack to his office or to the hospital and he'll practice medicine. Michelle Moore, no matter what you do, is not going to have Jason Taylor Moore back. She will - - she will have a child to raise, she will have other

16

things to do. You may not believe it, but what you do here is important. It's important in the larger context. There is a standard of care that you've heard them talk about is passing, but that standard means something. IT means that physicians and hospitals are not above the law. It means that they must comply with what is reasonable under the circumstances. And if they know that they're above the law, that they don't have to comply with that standard of care, they're not going to be held responsible for their actions, then the standard of care suffers. If they know that that standard of care is ample and when somebody calls out and when you're asked to do something, or something that's reasonable in terms of the care of that person, they they're going to think about that. They're going to think, if I don't do this, will I be held responsible. And quite frankly I don't think they believe that a Lee County jury will hold them responsible. They think that they're above the law. If they spent half as much time taking care of Taylor Moore as they have on defending this lawsuit - -

MR. R. UPCHURCH: May it please the Court? Excuse me, Counsel. That's uncalled for to argue that these Defendants think they are above the law and that - - that's improper and we request the jury be advised to disregard that.

THE COURT: I don't believe it exceeded the bounds. It'll be overruled. You may proceed.

¶40. In *Shell Oil Co. v. Pou*, 204 So.2d 155 (Miss. 1967), this Court found error in the trial court's submitting the punitive damage issue to the jury which was compounded when Pou's counsel in his closing argument

was permitted over objection, to state, after reading the instruction of the court authorizing the award of punitive damages, that the defendant was a corporation, had no soul, could neither go to heaven nor hell and "that the way that the law punishes a corporation for not paying their debts in a case like this, if you find that they owe actual damage, is to require them to pay a punitive damage."

*Id.* at 157. This Court, finding that the cumulative effect of the errors denied the appellants a fair trial and required the case be reversed and remanded for a new trial, held:

17

The only legitimate purpose of the [closing] argument of counsel in a jury case is to assist the jurors in evaluating the evidence and in understanding the law and in applying it to the facts. Appeals to passion or prejudice are always improper and should never be allowed.

*Id.*

¶41.    In *Woods v. Burns*, 797 So.2d 331, 334 (Miss. Ct. App. 2001), applying *Shell Oil*, the Court of Appeals determined that in order to reverse a judgment based on an improper argument claim, the court must find first "an 'abuse, unjustified denunciation or a statement of fact not shown in the evidence.'" (citing *Brush v. Laurendine*, 168 Miss. 7, 13-14, 150 So. 818, 820 (1933)), and then must find that it was "probable that this improper argument had a harmful influence on the jury." *Id.*

¶42.    Arguing that a party thinks he is "above the law" does not fall within the bounds of a case regarding standard of care. The purpose of this argument was not to assist the jurors in evaluating the evidence, but it was to excite their passions and prejudices and, thus, improperly influence them. Therefore, we find the trial court erred in overruling the objection made by Dr. Eckman and in finding that this improper argument did not exceed the bounds of the evidence.

## IV.    WHETHER THE TRIAL COURT ERRED IN GRANTING MICHELLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT.

¶43.    In *Jenkins v. Ohio Casualty Insurance Co.*, 794 So.2d 228, 232 (Miss. 2001), this Court held that on appeal a de novo standard of review applies to a trial court ruling granting summary judgment. In *Prescott v. Leaf River Forest Products, Inc.*, 740 So.2d 301, 308-09 (Miss. 1999), this Court observed:

On appeal this Court reviews de novo a trial court's decision to grant a motion for summary judgment, which should only be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

18

judgment as a matter of law." M.R.C.P. 56. A fact is material if it "tends to resolve any of the issues, properly raised by the parties." ***Webb v. Jackson***, 583 So.2d 946, 949 (Miss.1991) (citing ***Mink v. Andrew Jackson Casualty Ins. Co.***, 537 So.2d 431, 433 (Miss.1988) (quoting ***Mississippi Road Supply v. Zurich-American Insurance Co.***, 501 So.2d 412, 414 (Miss.1987))). The evidence must be viewed in the light most favorable to the non-moving party. If, in this view, the moving party is entitled to a judgment as a matter of law, then summary judgment should be granted in his favor. Otherwise, the motion should be denied. ***Brown v. Credit Center, Inc.***, 444 So.2d 358, 362 (Miss.1983). ***Morgan v. City of Ruleville***, 627 So.2d 275, 277 (Miss.1993).

Rule 56(c) of the Mississippi Rules of Civil Procedure provides that summary judgment shall be granted by a court if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c) (emphasis added). The moving party has the burden of demonstrating that there is no genuine issue of material fact in existence, while the non-moving party should be given the benefit of every reasonable doubt. ***Tucker v. Hinds County***, 558 So.2d 869, 872 (Miss. 1990).

¶44.    The complaint was filed on March 20, 2000, and an amended complaint was filed on August 24, 2000. In their answers Dr. Eckman and Aurora pled affirmative defenses including Miss. Code Ann. § 85-5-7(7) (1999) which states: "In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault."

¶45.    On September 13, 2001, Michelle filed a motion for summary judgment which was heard before the trial court on January 8, 2002. The motion for summary judgment asserted that Dr. Eckman had the burden of proof for his affirmative defenses. Dr. Eckman asserted in his Response to Plaintiff's Motion for Summary Judgment that § 85-5-7 operates as a matter of law and that invocation of the defense does not

19

require expert testimony. Prior to the hearing, Dr. Eckman provided no information indicating that there was fault to be attributed to a third party non-defendant. After hearing arguments the trial court ruled as follows:

> With regard to the motion concerning Section 85-5-7, the motion will be denied except as to any parties not named in this lawsuit. I think it's clear to the Court that if the defendants request an apportionment of fault instruction concerning the respective fault of the defendants, should the jury find fault with either of these defendants, they would be entitled to that. But I don't think that I saw anything in the material submitted to me which indicates that the defendants can show that there was any fault of any third party for which the jury would be warranted in allocating or apportioning such fault to. For that reason, the motion for summary judgment concerning Section 85-5-7 will be denied, except as to any parties not actual parties to this lawsuit, named defendants.

¶46. Dr. Eckman argues that the trial court ruling was contrary to § 85-5-7 and case law which allows a defendant to argue liability on the part of all parties at fault whether named in the lawsuit or not. Dr. Eckman relies in part upon *Dawson v. Townsend & Sons, Inc.*, 735 So.2d 1131 (Miss. Ct. App. 1999), and *Estate of Hunter v. General Motors Corp.*, 729 So.2d 1264 (Miss. 1999). In *Dawson*, the Court of Appeals noted:

> Since the date of trial the supreme court has resolved this troubling question. *Estate of Hunter v. General Motors Corp.*, 729 So.2d 1264 (¶ 32) (Miss.1999). The court concluded that participants in an event who for some reason are not joined in the litigation, so-called "phantom defendants," can nonetheless have their portion of fault assigned to them. A jury may not be instructed to consider only the parties actually sued, else the defendants who are present have been unfairly denied the benefits of our system of comparative fault. *Id.* For example, a claimant could settle with one defendant in order to go after a "deep pocket" defendant. *Id.* "There is no indication that the legislature intended to reserve for plaintiffs the sole and exclusive right to make allegations of fault before a jury and to deprive defendants of the opportunity to persuade a jury that fault for a given accident lies elsewhere." *Id.* at (¶ 34). We need not further restate the analysis.

735 So.2d at 1131.

¶47.    Michelle argues that Dr. Eckman raised the affirmative defense and, therefore, had the burden to prove any apportionment of fault. In ***Pearl Public School District v. Groner***, 784 So.2d 911, 916 (Miss. 2001), this Court stated:

> The District alleges that the amount of damages should have been apportioned among all potentially responsible parties. We agree. On the other hand, apportionment is an affirmative defense that must be pled and proven. This Court has held that "[i]t is fundamental that the burden of proof of affirmative defenses rests squarely on the shoulders of the one who expects to avoid liability by that defense." ***Marshall Durbin Cos. v. Warren***, 633 So.2d 1006, 1009 (Miss.1994).

¶48.    This Court finds that the trial court did not err by granting partial summary judgment in Michelle's favor. Dr. Eckman did not provide sufficient proof that created a genuine issue of material fact. Dr. Eckman's Answer to Plaintiff's first set of Interrogatories, supplemental answers to plaintiff's interrogatories, and the deposition of Dr. Killeffer, filed as part of a supplemental exhibit, did not indicate any fault attributable to a third party. Also there were no affidavits or other information for review in the record. This issue is without merit.

¶49.    Because this Court is reversing and remanding this case for a new trial with instructions, the remaining issues need not be addressed.

## CONCLUSION

¶50.    A comprehensive review of the record reveals three specific instances which constitute reversible error: the failure to present Dr. Eckman's superseding cause instruction to the jury, the cumulative and prejudicial nature of the photographs and videos, and the improper statements made during closing argument. Therefore, the judgment of the trial court is reversed, and the case is remanded for a new trial consistent with this opinion.

21

¶51.    **REVERSED AND REMANDED.**

**PITTMAN, C.J., SMITH AND WALLER, P.JJ., COBB AND DICKINSON, JJ., CONCUR. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

**EASLEY, JUSTICE, DISSENTING:**

¶52.    The majority reverses and remands on the three issues of the jury instruction, the day in the life videos and other photographs, and closing statement comments. I respectfully dissent to all three issues and would affirm the judgment of the Lee County Circuit Court.

## I.  Instruction D1-12

¶53.    Dr. Eckman argues that the negligence of the hospital nursing staff, by failing to perform neurological check every two hours as ordered by Dr. Eckman, superceded any negligence on his part and that jury instruction D1-12 should have been given to the jury. On the other hand, Michelle argues that the jury instruction (1) incorrectly stated the law, and (2) the evidence showed that Dr. Eckman's negligence occurred before, during and after any negligence attributed to the nursing staff.

¶54.    "When reviewing jury instructions we will review all of the instructions together, rather than each isolated instruction." *Jackson v. Daley*, 739 So.2d 1031, 1037 (Miss. 1999) (citing *Hull v. State*, 687 So.2d 708, 722 (Miss. 1996)). In *Coho Resources, Inc. v. McCarthy*, 829 So.2d 1, 22 (Miss. 2002), this Court stated:

> As we have said, "on appellate review, we do not isolate the individual instruction attacked, but rather we read all of the instructions as a whole." *Payne v. Rain Forest Nurseries, Inc.*, 540 So.2d 35, 40-41 (1989). "Defects in specific instructions do not require reversal where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law." *Id*. at 40-41. Further, "[t]he trial court enjoys considerable discretion regarding the form and substance of jury instructions."

22

*Higgins v. State*, 725 So.2d 220, 223 (Miss.1998). Mississippi's law on jury instructions has been summarized as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence. We have also held a court's jury instructions will not warrant reversal if the jury was fully and fairly instructed by other instructions.

*Id*. at 223.

*Coho*, 829 So.2d at 22.

¶55.    Dr. Eckman cites many examples that demonstrate that the cardiac arrest would not have happened but for the nurses' failure to monitor Taylor every other hour from 10:00 p.m. February 21 to 6:00 a.m. February 22.  Michelle argues that Dr. Eckman's negligence occurred prior to, during and after the nurses negligence because he failed to timely operate on Taylor after the arrest.  Michelle claims that the blood vessels in the back of Taylor's head were still open after the arrest and prompt surgery would have given Taylor "a good functional recovery."

¶56.    In *M&M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts*, 531 So.2d 615 (Miss. 1988), a case involving a multiple car accident resulting in a wrongful death claim,  this Court addressed the issue of intervening cause and held:

> In cases involving the issue of an intervening cause, this Court has laid particular stress on the concept of "putting in motion". That is, the original actor will not be absolved of liability because of a supervening cause if his negligence put in motion the agency by or through which injuries were inflicted. *Capitol Tobacco & Specialty Co. v. Runnels*, 221 So.2d 703, 705 (Miss.1969). *See also*, e.g., *Blackmon v. Payne*, supra, 510 So.2d at 487; *Robison v. McDowell*, 247 So.2d 686, 688 (Miss.1971); *Simmons v. Amerada Hess Corp.*, 619 F.2d 440, 441 (5th Cir.1980).

And "if the occurrence of the intervening cause might reasonably have been anticipated, such intervening cause will not interrupt the connection between the original cause and injury." ***Ross v. Louisville and Nashville RR.***, 178 Miss. 69, 84, 172 So. 752, 755 (1937). *See also*, e.g., ***Touche Ross v. Commercial Union***, supra, 514 So.2d at 323; ***Blackmon v. Payne***, supra, 510 So.2d at 487; ***McCorkle v. United Gas Pipe Line Co.***, 253 Miss. 169, 188, 175 So.2d 480, 489 (1965). In determining whether the actor's negligence was the proximate cause of the injury, it is not necessary that the actor should have foreseen the particular injury that happened; it is enough that he could have foreseen that his conduct could cause some injury. *See*, e.g., ***Nobles v. Unruh***, 198 So.2d 245, 248 (Miss.1967); ***Cumberland Telephone & Telegraph Co. v. Woodham***, 99 Miss. 318, 332, 54 So. 890, 891 (1911).

In ***Southland Management Co. v. Brown***, 730 So.2d 43, 46 (Miss. 1999), this Court affirmed the Court of Appeals' ruling that an intervening cause occurred which relieved an apartment management company from liability. In that case, employees of the apartment complex deposited bathroom tiles in a wooded area near the complex. *Id*. at 44. A group of children playing in the woods began to throw the tiles at one another resulting in an eye injury to one child. *Id*. at 45. This Court affirmed the Court of Appeals' ruling that it was not foreseeable, and thus, an intervening cause that inert tiles would be thrown by one child and cause injury to another. *Id*. at 48. In ***Southland***, this Court relied upon the definition of a superceding cause as follows:

> The Second Restatement of Torts has attempted to draw the dividing line by shielding a defendant from liability if the intervening force can be classed as a "superseding cause." See Restatement (Second) of Torts § 440 (1965 ). The Restatement defines a superseding cause as follows:

> A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

*Id*.

¶57. Here, the acts of the nursing staff cannot be said to be an intervening and superceding cause. While it is true that many expert witnesses testified that the nursing staff fell below the standard of care by failing to adequately monitor and perform the neurological checks on Taylor the night of February 21-22, 1999, there is also testimony that Dr. Eckman fell below the standard of care before, during and after the time period in which the nurses were to monitor Taylor. This case is distinguishable from *Southland* in that there was no break in the chain of events. In *Southland* this Court determined that the abandoned tiles were inert only to be later picked up and thrown by playing children. In essence the chain of events was broken. In *M&M*, a truck with faulty tail lights caused another driver to avoid a collision with the truck. Because the second vehicle attempted to avoid a collision with the truck, a chain of events occurred resulting in a collision involving two other vehicles.

¶58. Here, the nursing staff's negligence was reasonably foreseeable and does not fall with in the confines of an intervening and superceding act. Thus, the trial court did not abuse its discretion by denying the instruction.

## II. Videos and photographs

¶59. "The introduction of photographs and motion pictures is a matter for the sound discretion of the trial court and that court is afforded wide latitude in exercising this discretion." *Jesco, Inc. v. Shannon*, 451 So.2d 694, 702 (Miss. 1984). The admission or exclusion evidence, such as photographs, "is within the sound discretion of the trial court and that decision will be upheld unless there is an abuse of discretion." *Walker v. Graham*, 582 So.2d 431, 432 (Miss. 1991); *Trapp v. Cayson*, 471 So.2d 375, 381 (Miss. 1985). This Court in *Jesco* further held:

25

Where the only purpose of photographs is to influence and prejudice the jury they should be excluded, but where they visualize the injury at a stage subsequent to the accident, they may not be excluded solely because they may contain emotional overtones. *Jensen v. South Adams County Water and Sanitation District*, 149 Colo. 102, 368 P.2d 209 (1962), and *Godvig v. Lopez*, 185 Ore. 301, 202 (Id. at 816).

Caution again is stated to trial judges to preview such evidence to determine its probative value as against its prejudicial effects upon a jury.

*Id. See also Motorola Communications & Electronics, Inc. v. Wilkerson,* 555 So.2d 713, 720-22 (Miss. 1989) (a photo album containing 15 pictures of the deceased depicting his physical condition prior to death properly admitted); *Trapp*, 471 So.2d at 381 (a 120-minute day in the life video of a paraplegic performing daily tasks was admissible); *Butler v. Chrestman*, 264 So.2d 812, 816 (Miss. 1972) (color slides depicting the healing of a facial injury was properly admitted, but a five minute motion picture depicting the victim moving from bed to a wheel chair was improperly admitted where the film periodically focused on victim grimacing, and seemingly crying from excruciating pain and suffering rather than the actual state of her injuries).

¶60.	Mississippi Rule of Evidence 401 define relevant evidence as follows:

"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

¶61.	Mississippi Rule of Evidence 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶62.	Dr. Eckman contends that the trial court erred by admitting certain photographs and two "day in the life" videos of Taylor. Michelle argues that as a plaintiff she is required to assert every element of a

26

negligence claim including injury and damage. She cites the wrongful death statute and *Gatlin v. Methodist Medical Center, Inc.*, 772 So.2d 1023, 1030-31 (Miss. 2000), which includes proving "funeral and medical expenses of the decedent, the present net cash value of the life expectancy of the decedent, the loss of society and companionship of the decedent, the pain and suffering experienced by the deceased between the time of injury and the subsequent demise, and punitive damages."

¶63. The majority states that on remand the first video would be admissible if the proper edits were made to it. The second video is not admissible because it is cumulative and prejudicial. In addition, the majority writes that the photographs from Taylor's high school and Michelle's baby shower are not admissible since they are considered to be prejudicial. The majority also found that the wedding album is cumulative and is not admissible.

### A. Videos of a day in the life of Taylor

¶64. Video 2 depicting Taylor with his mother, Minerva, at the rehabilitation hospital was actually shown to the jury during Minerva's testimony and prior to Video 1, which was shown during Michelle's testimony. Video 2 depicts scenes after Taylor's arrest and Video 1 depicts scenes before and after his arrest.

¶65. Video 1 contained still photographs and motion video, including but not limited to, some of the following items: wedding photographs and a portion of the wedding ceremony video; family Christmas video; graduation ceremony and ball game of Taylor's stepson; various hospital photographs; Michelle with Taylor and their child; Taylor being washed, clothed and fed by staff; Taylor's stepson marriage wiping Taylor's mouth; Taylor being taken for a walk and having physical therapy; Taylor with Michelle and the two children, Taylor with his stepson lying on Taylor's chest.

27

¶66. Video 2 contained still photographs and motion video including but not limited to some of the following items: Taylor in the rehabilitation hospital; Taylor being washed and his hair being washed by staff; the instructions posted on the door of Taylor's room at the rehabilitation hospital; Taylor's mother wiping his mouth; Taylor being pushed in a wheelchair with his child on his lap; Taylor's stepson on Taylor's chest with Taylor's mother telling Taylor that she loves him and sniffing at the time; and an ending still photograph with Taylor staring with his mouth open.

¶67. Mississippi case law allows videos depicting a "day in the life" videos. After reviewing Video 1 and 2, I believe that the footage was relevant to proving Michelle's case. The footage showed the type of person that Taylor was prior to his injuries, the subsequent type of care that Taylor required and his inability to care for himself, and his drastically diminished capacity to interact and communicate with his wife, child and family, among other things. The trial court did not err in admitting Video 1 and 2 as described above.

## B. High school photographs and senior activities sheet.

¶68. Three photographs depicting Taylor in high school and a high school key indicating his school activities were identified by his mother, Minerva Moore (Minerva), in her testimony. Minerva testified that Taylor and Michelle met in 1994 or 1995 dated for about a year and were married. Michelle later testified that she went to the same high school as Taylor although he was three years ahead of her. Michelle argues that the high school photographs provide part of the foundation of the proof of present net cash value of the life of Taylor. I agree.

¶69. Taylor was a young man when he died and the high school photographs and key information provided insight into the type of person and student that Taylor was. The items provided partial foundation of Taylor's present net cash value of life, and the trial court did not err in admitting these photographs.

### C. Michelle at her baby shower.

¶70. The majority finds that the photographs of the baby shower for Michelle and Taylor's baby are prejudicial. The fact of the matter is that due to Taylor's injuries he could no longer participate in normal life events, such as the baby shower, birth of his child, or have any hope of a normal family life. Michelle had the burden of proving her claim, and she did suffer from Taylor's inability to participate in this event. The photographs merely illustrate Taylor's lack of society and companionship. Therefore, the trial court did not err in admitting these photographs.

### D. Photographs of Taylor and Michelle's wedding

¶71. The trial court admitted thirty-six wedding photographs depicting Taylor and Michelle's wedding. Michelle argues that the wedding photographs address the loss of society and companionship.

¶72. In light of the portion of the actual wedding ceremony contained in Video 1, 36 additional wedding photographs are cumulative. Even without the wedding ceremony video, 36 still wedding photographs are excessive. I agree with the majority on the cumulative nature of the photographs. However, the photographs do touch on Michelle's loss of society and companionship. Given that the wedding was one event in their lives, albeit a major event, having 36 photographs of that one event and the wedding video is cumulative. Notwithstanding the cumulative nature of the photos, I believe that the error is harmless and does not merit reversal and a new trial on this issue.

### III. Closing argument statements

¶73. Attorneys have wide latitude in closing arguments. *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998). Notwithstanding the wide latitude afforded in closing arguments "[t]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Sheppard v. State*, 777 So.2d 659, 661 (Miss. 2000). This Court has held that "any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration" *Haggerty v. Foster*, 838 So.2d 948, 961 (Miss. 2003). The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. *Alpha Gulf Coast, Inc. v. Jackson*, 801 So.2d 709, 727 (Miss. 2001) (citing *Roundtree v. State*, 568 So.2d 1173, 1177 (Miss.1990)).

¶74. Dr. Eckman asserts that the trial court erred by overruling closing argument objections to statements made by counsel for Michelle. During closing arguments, counsel for Michelle stated:

> Tomorrow, Dr. Eckman will leave this courtroom or leave his house, and he'll go back to his office or to the hospital and he'll practice medicine. Michelle Moore, no matter what you do, is not going to have Jason Taylor Moore back. She will - she will have a child to raise, she will have other things to do. You may not believe it, but what you do here is important. It's important in the larger context. There is a standard of care that you heard them talking about in passing, but that standard means something. **It means that physicians and hospitals are not above the law. It means that they must comply with what is reasonable under the circumstances. If they know that they are above the law, that they don't have to comply with that standard of care, they're not going to be held responsible for their actions, then the standard of care suffers.** If they know that that standard of care is ample when somebody calls out and when you're asked to do something, or you know you should do something, or something that's reasonable in terms of the care of that person, then they are going to think about that. They're going to think, if I don't do this, will I be held responsible. And quite frankly I don't think they believe that a Lee county jury will hold them responsible. **They think that they are above the law.** If they had spent half as much time caring of [sic] Taylor Moore as they have on defending this lawsuit -

30

| | |
|---|---|
| Mr. R. Upchurch: | May it please the court? Excuse me, Counsel, that's uncalled for to argue that these defendants think they are above the law and that - that's improper and we request that the jury be advised to disregard that. |
| The Court: | I don't believe it exceeded the bounds. It will be overruled. You may proceed. |

¶75.    Dr. Eckman asserts that the comments were "outside the confines of the record" and were intended to appeal to the prejudices of the jury to return a verdict based upon sympathy, emotion, and passion rather than evidence. *See* **Boyd Constr. Co. v. Bilbro**, 210 So.2d 637, 641 (Miss. 1968); **Shell Oil Co. v. Pou**, 204 So.2d 155, 157 (Miss. 1967).   He argues that there was no evidence in the record that he or Aurora considered themselves above the law, that they believed that the jury would not hold them responsible; nor the time in which they prepared for the trial.  Michelle argues that the comments relate to the standard of care and holds them accountable for a failure to comply with the standard.  The trial court determined that the argument did not exceed the bounds of closing argument.  The statements by Michelle's counsel were in closing argument where there is wide latitude in attorney comments.   Any improper comments are viewed in context while considering the circumstances of the case.  Given that this was a case involving alleged medical negligence where the standard of care was at issue, the trial court did not abuse its discretion by allowing the comments.  The comments merely reflect that if a jury does not uphold a minimum standard of  care which is reasonable for the circumstances of a case then the standard will suffer and hospitals and doctors will not  be held accountable for their actions.

¶76.    For these reasons, I respectfully dissent and do not join the majority opinion.  I would find no reversible error and affirm the judgment of Lee County Circuit Court.