# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CT-00529-SCT

*JACKIE TENTONI, INDIVIDUALLY, AND AS NEXT FRIEND ON BEHALF OF HER MINOR CHILDREN, MELANIE TENTONI, JOHNATHAN TENTONI AND PHILLIP TENTONI*

*v.*

*WARREN W. SLAYDEN*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/30/2004 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOSEPH S. GATLIN, III |
| ATTORNEY FOR APPELLEE: | SHELLY G. BURNS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 11/08/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Jackie Tentoni sued Warren W. Slayden in the Madison County Circuit Court, alleging negligence and gross negligence due to bodily injuries and property damage resulting from an automobile accident.  The Madison County Circuit Court entered a final judgment after a trial resulting in a jury verdict in favor of Slayden and against Tentoni.  On appeal, the Court of Appeals reversed and rendered as to liability and remanded the case to

the Madison County Circuit Court for a new trial on damages. Inasmuch as we find that the Court of Appeals erred, we reverse its judgment and reinstate and affirm the trial court judgment entered in favor of Slayden and against Tentoni, consistent with the jury verdict.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.    On January 1, 1999, Jackie Tentoni was driving her 1996 Suzuki Sidekick southbound in the right lane on Interstate 55 in Carroll County. In the vehicle with Tentoni were her three children, Melanie,[1] Phillip, and Jonathan.[2] Melanie was in the front seat next to Tentoni and was wearing a seatbelt. Phillip was in the back seat, not wearing a seatbelt, and Jonathan was lying down in the back area of the Suzuki, unrestrained. Following directly behind Tentoni in a 1995 Buick was Warren W. Slayden, along with his wife, Brenda, and their daughter, April.

¶3.    Although it was raining, Slayden had been driving behind Tentoni in the southbound right lane for miles, without incident.[3] While traveling down I-55 in Carroll County, Tentoni

[1]Melanie was referred to as "Melonie" throughout the record, but we will refer to her by the name as used by her mother in the pleadings and documents filed in the this cause.

[2]Although there are multiple spellings throughout the record, "Jonathan" is used most consistently.

[3]In fact, according to Slayden's testimony, he had entered I-55 at "the Sardis exit and was going south and returning to Madison. It was raining, as I had mentioned; and, when it's raining like that, I prefer to be behind a car. Because when you've got a car in front of you the spray tends to be sprayed out before you go through it. And so I had been behind Ms. Tentoni's vehicle for quite a few miles. And we were coming up behind an 18-wheeler." Thus, taking Slayden's testimony literally, he traveled behind Tentoni's vehicle without incident from Sardis, in northern Panola County, to the point of the accident, which according to Tentoni, was "196 mile marker around Duck Hill Exit on I-55." This would be

2

pulled into the left lane to pass an eighteen-wheeler tractor-trailer rig. Slayden also moved into the left lane behind Tentoni. By the time Tentoni had passed the eighteen-wheeler and pulled back into the right lane in front of the eighteen-wheeler, all three vehicles had started down a hill. Tentoni reduced her speed, and the incline caused the descending eighteen-wheeler to increase its speed, thus creating insufficient space for Slayden to pull in behind Tentoni and in front of the eighteen-wheeler. Slayden chose to maintain his speed in the left lane and as he did, his vehicle hydroplaned and came in contact with Tentoni's vehicle. Both Tentoni and Slayden acknowledged that their vehicles collided twice, but according to Tentoni, it was a mysterious third impact which caused Tentoni's vehicle to travel down an embankment and collide with a tree, resulting in most of the injuries and damages suffered by Tentoni and her children.[4]

¶4.    Slayden testified at trial that he was traveling in the left lane beside Tentoni at the speed of sixty-eight miles per hour, within the posted seventy-mile-per-hour speed limit; Tentoni testified at trial that she was traveling approximately fifty-five miles per hour.[5] Slayden testified that he and Tentoni were traveling side-by-side; Tentoni testified that she

_____

a distance of between fifty and sixty miles that Slayden had followed Tentoni, without incident.

[4]Taking the evidence in the light most favorable to Tentoni, at least some physical injuries and property damage were suffered due to the second impact by Slayden. This will be discussed in more detail, *infra*.

[5]On the other hand, the investigating officer, state trooper Billy McClurg, testified that Tentoni told him she was traveling at an estimated speed of 60 mph, as opposed to the 55 mph Tentoni testified to at trial.

3

noticed Slayden when he was "coming towards my side, more towards my door;" Slayden testified that he hydroplaned in the left lane and moved between one foot to one-and-one-half feet into the right lane, bumping Tentoni's left front bumper. Slayden further testified that his vehicle then spun and hit Tentoni's right back bumper, sending Tentoni off to the right and Slayden off to the left, where he came to a stop in the median. After Tentoni's vehicle went to the right, Slayden did not see where Tentoni's vehicle came to rest. The eighteen-wheeler passed between the two vehicles but returned to the scene; however, neither Slayden nor Tentoni obtained the truck driver's name and contact information.

¶5. Tentoni testified that after the first two impacts, she maintained control of her vehicle. She described the first impact as a "light tap" and the second impact as being "much harder than the first." According to Tentoni, she came to a complete stop on the shoulder of I-55 and attempted to shift her vehicle into park. However, of significant import, Tentoni testified that as she was attempting to place her vehicle into park, there was a third impact which sent her vehicle completely off the road, where she traveled down an embankment over logs and crashed into a tree. Tentoni described the third impact as being "something light" which "hit me way behind, something just very, very light, I heard a loud ner-er-er-er-er-er." Tentoni further testified that the third impact caused her to lose control of her vehicle, causing her and her children to suffer most of their injuries. Slayden testified that Tentoni did nothing wrong. Officer Billy McClurg, who responded to the scene, issued no citations to Slayden due to the rainy conditions.

4

¶6.     A passerby who identified himself as a doctor called an ambulance, which transported Tentoni and her three children to the emergency room at Grenada Lake Medical Center.  The Slayden family also traveled to the hospital and stayed with the Tentonis until they received a good prognosis for each family member.

¶7.     Tentoni filed suit individually and on behalf of her three children in the Circuit Court of Madison County on January 13, 2000.  Slayden and "John Does 1-10" were named as defendants.[6]  Even though the incident giving rise to this litigation occurred in Carroll County, Tentoni and her three children, as well as Slayden, were all Madison County residents at the time of the commencement of this suit.  In her complaint, Tentoni alleged that "[Slayden], suddenly and without prior warning, negligently lost control of his vehicle and negligently collided with [Tentoni's] vehicle."  Tentoni further alleged that Slayden was negligent in that he: (a) failed to stop prior to colliding with [Tentoni's] vehicle; (b) failed to maintain a proper lookout for other vehicles; (c) failed to keep his vehicle under proper control in light of the then-existing weather conditions and conditions of the roadway; (d) failed to maintain a safe speed; and (e) failed to operate his vehicle in a safe and prudent manner, pursuant to the laws of the state of Mississippi and the rules of the road.

---

[6]In her complaint, Tentoni alleged that the defendants, "John Does 1 through 10," were, *inter alia*, "those entities, corporations, partnerships, and individuals whose names are presently unknown to [Tentoni] and who are liable and/or responsible to [Tentoni] for the tortuous (sic) acts described in this Complaint." However, the record reveals that the pleadings were never amended to reflect the true identity of any of these John Doe defendants (*see* Miss. R. Civ. P. 9(h)), and the evidence presented at trial and the jury instructions addressed only the relevant issues as to the defendant, Slayden.

5

¶8. A jury trial[7] was conducted December 14-16, 2004, Judge Samac S. Richardson, presiding. Tentoni alleged, *inter alia*, that she and her children had sustained multiple injuries as a result of the accident caused by Slayden's negligence. Tentoni and the children had seen numerous medical professionals concerning their alleged injuries. However, Slayden's medical expert, Dr. John Lonson,[8] testified that the only visits which were "reasonable and necessary" were the initial visit to Grenada Lake Medical Center for Tentoni and her three children and a follow-up visit to the doctor for Tentoni.

¶9. The jury returned a verdict in favor of Slayden, which stated, "We, the jury, find for the defendant, Warren W. Slayden, as to all plaintiffs, Jackie Tentoni, Melanie Tentoni, Jonathon (sic) Tentoni, and Phillip Tentoni." The trial court subsequently entered its final judgment consistent with the jury verdict. After conducting a hearing on January 31, 2005, the trial judge denied Tentoni's motion for a new trial,[9] and Tentoni appealed to this Court, raising two issues: (1) whether the trial court erred in refusing to give Tentoni's peremptory

---

[7] Tentoni refused Slayden's Offer of Judgment of $20,795.97, which included $15,000 to cover the medical bills and $5,795.97 for property damage to the Suzuki.

[8] Slayden states in his brief that the correct spelling of this doctor's last name is "Lancon." While we in no way dispute this assertion, for the sake of consistency, and to avoid confusion, we will refer to this doctor by the name used throughout the record in this case.

[9] Tentoni filed a pro se motion for a new trial. This action prompted Tentoni's trial counsel to file a motion to withdraw as Tentoni's counsel. The motion to withdraw was joined by Tentoni. The trial judge entered an agreed order allowing Tentoni's trial counsel to withdraw and a few days later, the trial judge entered an order denying Tentoni's motion for a new trial. No motion for a judgment notwithstanding the verdict was ever filed. Tentoni subsequently retained new counsel for appeal purposes.

instruction to the jury; and (2) whether the verdict was against the overwhelming weight of the evidence or a product of bias, passion and prejudice. We assigned this case to the Court of Appeals.

## PROCEEDINGS IN THE COURT OF APPEALS

¶10.    In an 8-2 decision, the Court of Appeals reversed and rendered as to liability and remanded this case to the trial court for a new trial on damages. Finding that ***Barkley v. Miller Transporters, Inc***., 450 So. 2d 416 (Miss. 1984) was controlling, that court stated, *inter alia*, that "Slayden admitted that it was raining and the road was wet. He admitted that he was aware of the dangers of hydroplaning. Nevertheless, he testified that he did not slow down. He maintained a speed near the posted speed limit. He admitted that he lost control of his vehicle when his car hit a patch of standing water. He ignored the danger and as a result lost control of his car. This testimony went undisputed. We find that [Tentoni] was entitled to a peremptory instruction on negligence. Additionally, since Slayden admitted causation, [Tentoni] was entitled to a directed verdict on liability." ***Tentoni v. Slayden***, 2006 Miss. App. LEXIS 914, *5 (¶7) (Miss. Ct. App. 2006). Further, the Court of Appeals held that statements made by Slayden's counsel at trial appeared "to be intended to ignite the jury's passions in favor of Slayden and against the Tentonis – Jackie, in particular. On remand, Slayden's counsel is instructed not to repeat this conduct." ***Id.*** at *9 (¶14).

¶11.    Judge Southwick, in a dissent (joined by Judge Barnes), found that ***Barkley*** was distinguishable from the case *sub judice*. ***Tentoni***, 2006 Miss. App. LEXIS 914, **9-25 (¶¶16-35) (Southwick, J., dissenting). Not being satisfied with a mere study of our opinion

7

in **Barkley**, Judge Southwick retrieved and studied this Court's record in **Barkley**. **Id.** at **12-13 (¶20) (Southwick, J. dissenting).

## DISCUSSION

¶12. In his petition for writ of certiorari, Slayden asserts that the Court of Appeals misapplied **Barkley**, and that the Court of Appeals' decision in the case *sub judice* was likewise inconsistent with prior decisions of this Court. We will address these issues as they were stated to the Court of Appeals.

### I. WHETHER THE TRIAL COURT ERRED IN REFUSING A PEREMPTORY INSTRUCTION TO THE PLAINTIFF.

¶13. The Court of Appeals found that the trial court erred in not granting a peremptory instruction (or a directed verdict) as to liability against Slayden and in favor of Tentoni, and thus remanded this case to the trial court for a new trial "to assess the proper damages." **Tentoni**, 2006 Miss. App. 914, **6-7 (¶10).

¶14. We review a trial court's refusal to grant a peremptory instruction *de novo*, giving the non-moving party the benefit of all reasonable inferences which may be drawn from the evidence. "If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom present a question for the jury," the peremptory instruction should not be granted. **Windmon v. Marshall**, 926 So. 2d 867, 872 (Miss. 2006) (quoting **Entergy Mississippi, Inc. v. Bolden**, 854 So. 2d 1051, 1055 (Miss. 2003)). "Additionally, this Court has held that a trial court should submit an issue to the jury only if

8

the evidence creates a question of fact concerning which reasonable jurors could disagree."

*Id.*

¶15.    During the jury instruction conference at the conclusion of the presentation of the evidence, Tentoni, through counsel, submitted jury instruction P-12, which was given by the trial judge and designated as the trial court's Instruction No. 10.  This instruction will be set out verbatim later in this discussion, but suffice it to state here that this instruction was an "elements" instruction informing the jury that if the jury found certain facts to exist, including a violation of one or more of the rules of the road (statutes) by Slayden, then Slayden was negligent, and if the jury further found that such negligence was the proximate cause or a proximate contributing cause of the accident and resulting injuries suffered by Tentoni and her three children, then the jury must return a verdict in favor of Tentoni and her children and against Slayden.  However, Tentoni argues that she was entitled to a peremptory instruction because she presented evidence which proved each and every element set out in Instruction No. 10 (and on which reasonable jurors could not disagree), and that she also established that Slayden was negligent as a matter of law.

¶16.    Tentoni "bears the burden of producing evidence sufficient to establish the existence of the conventional tort elements of duty, breach, proximate causation, and damages." *Simpson v. Boyd*, 880 So. 2d 1047, 1050 (Miss. 2004) (citing *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 794 (Miss. 1995)).  Tentoni argues that Slayden breached

9

his duty by violating four specific statutes.[10] Furthermore, Tentoni argues that Slayden's medical expert, Dr. Lonson, admitted that at least some of the medical expenses incurred by Tentoni and her children were a result of the subject accident and were "reasonable and necessary" for the treatment of the injuries suffered.

¶17. Tentoni also argues that the proximate cause of Tentoni's car leaving the roadway was clear and uncontradicted, as Slayden testified that he hit the Suzuki twice, which "shot her off to the right." However, Tentoni's own testimony contradicts this argument, as she testified that there was a *third impact*. Tentoni testified, *inter alia*, that Slayden moved over into her lane of travel and collided twice with her vehicle, with the second impact forcing her off the road, and as she was attempting to put her vehicle into park, another impact forced her vehicle down the embankment over logs and debris before colliding with a pine tree. While there is disputed testimony as to whether there were two or three impacts, we find this disputed evidence to be of no moment in today's case. Extensive evidence was before the jury as to the conduct of the parties and the circumstances with which they were confronted as the parties' vehicles and the eighteen-wheeler were southbound on I-55. It was for a properly-instructed jury to determine the traditional tort issues of duty, breach of duty, causation and damages.

¶18. Unquestionably, the jury heard extensive testimony concerning the injuries and damages allegedly suffered by Tentoni and her three children as a result of this accident.

---

[10]These statutes are Miss. Code Ann. §§ 63-3-505, 63-3-603, 63-3-609, and 63-3-611 (Rev. 2004).

However, the extent of these damages was hotly contested by Slayden. The jury learned early on during the cross-examination of Tentoni by Slayden's counsel that after the subject accident of January 1, 1999, Tentoni was involved in not one – not two – not three – not four – but five separate accidents, some of which resulted in further injuries to Tentoni.

¶19. We now return to the jury instructions, again remembering that Tentoni asserts that she was entitled to a peremptory instruction on both negligence and liability. We now set out verbatim the previously-mentioned jury instruction P-12, submitted by Tentoni's counsel, which was given by the trial judge and designated as the trial court's Instruction No. 10.

> The Court instructs the jury that the law of the State of Mississippi requires a driver of a motor vehicle to drive at a reasonable rate of speed for the conditions then and there existing; to keep and maintain a proper lookout for other vehicles using the roadway; and to maintain his or her vehicle under free and reasonable control and to drive in his lane of travel and to not change lanes until and unless he can do so safely; and if you believe from a preponderance of the evidence that Warren W. Slayden, while traveling south on Interstate 55 in the left hand lane at a time when the roadway was wet, either drove his vehicle at a greater rate of speed than was reasonable under the conditions then and there existing, and/or that he failed to keep and maintain a proper lookout for other vehicles using the roadway, and/or that he failed to maintain his vehicle under free and reasonable control and/or that he failed to stay in his lane of travel and moved over into plaintiff's lane of travel and that as a result of the aforesaid, he lost control of his vehicle and came over into plaintiff's lane of travel and collided with the plaintiff, then he is guilty of negligence, and if you further believe from a preponderance of the evidence that such negligence, if any, *was the proximate cause or a proximate contributing cause of the accident* in question and the injuries suffered by Jackie Tentoni, Melanie Tentoni, Jonathan Tentoni, and Phillip Tentoni, if any, then you should find for the plaintiffs and against the defendant, Warren W. Slayden.

(Emphasis added).

¶20. In considering Instruction No. 10, the jury had to find by a preponderance of the evidence that Slayden breached his duty to Tentoni and her children and that this breach of duty was the proximate cause or a proximate contributing cause of the accident and any injuries suffered by the Tentonis. Additionally, Slayden, through counsel, submitted jury instruction D-12A, to which Tentoni's counsel had no objection; therefore, the trial judge gave jury instruction D-12A and designated it as the trial court's Instruction No. 8. This instruction stated:

> The charge laid by the Plaintiffs against Mr. Slayden is one of negligence. You cannot presume that Mr. Slayden was negligent. The Plaintiffs may recover on the charge of negligence against Mr. Slayden only if it is sustained by a preponderance or greater weight of the credible evidence, and it is not the duty of Mr. Slayden to disprove the charge, but, rather, the law casts the burden of proof upon the Plaintiffs; and such charge of negligence must be sustained by a preponderance of the credible evidence. Therefore, if the Plaintiffs have failed to prove that Mr. Slayden acted unreasonably, then your verdict must be in his favor. ***Further, even if you find that Mr. Slayden failed to act reasonably, your verdict must be in his favor unless the Plaintiffs prove that his failure caused the accident. In other words, if you conclude that the accident was unavoidable in any event, then you must return a verdict in Mr. Slayden's favor.***

(Emphasis added). Obviously, it can reasonably be inferred from the evidence, the jury instructions given, and the jury verdict, that the jury deemed Slayden's hydroplaning to have been unavoidable on his part, thus exonerating him of ***all*** liability for any resulting injuries allegedly suffered by Tentoni and her children, notwithstanding the first and second impacts which Slayden admitted had occurred.[11] Also, on this point, the investigating officer, state

---

[11]As Slayden testified at trial, when he was in the left lane alongside Tentoni after Tentoni and Slayden had successfully passed the eighteen-wheeler, Slayden was in essence

12

trooper Billy McClurg, testified that he gave no citation as a result of this accident "due to the rain, I mean this happens. Anytime it rains this happens on Interstate 55."

¶21.   Returning to the Court of Appeals' opinion in the case *sub judice*, we respectfully disagree with that court's application of **Barkley** to this case. We find, as did Judge Southwick, that **Barkley** "very much is limited to its facts, in part because there is so little from which the measure of neglected care can be discerned." **Tentoni**, 2006 Miss. App. LEXIS 914, *18 (¶26). In **Barkley**, the plaintiff was driving on two-lane Highway 98, being followed by the defendant driver of an eighteen-wheeler tractor-trailer rig. As the truck driver attempted to pass the plaintiff on a stretch of Highway 98 which had recently been asphalted, he lost control of his truck, and even though there was no contact between the two vehicles, the defendant's actions forced the plaintiff off the highway, causing the accident and resulting injuries. However, unlike today's case, in **Barkley**, by the time of the accident, both drivers had passed a road sign cautioning travelers that this portion of the highway "was slippery when wet." **Barkley**, 450 So. 2d at 417. As we noted earlier, Judge Southwick, in preparing his dissent in today's case, was not satisfied with a mere study of our opinion in **Barkley**, so he likewise retrieved and studied this Court's record in **Barkley**. **Tentoni**, 2006 Miss. App. LEXIS 914, **12-13 (¶20) (Southwick, J. dissenting). We agree with Judge

---

confronted with a dilemma – increase his speed (above what he thought was a safe speed in rainy conditions) in order to pass Tentoni; decrease his speed and fall in behind the eighteen-wheeler causing his vehicle (windshield) to be heavily sprayed with rain/water by the eighteen-wheeler; or, maintain the same speed and simply continue traveling in the left lane alongside Tentoni's vehicle, which was in the right lane.

13

Southwick that this Court's decision in **Barkley** "indicate[d] that it was the slippery and wet new asphalt . . . a condition for which a warning sign had been placed and seen by the defendant, that caused the defendant to lose control." **Id.** at*13 (¶20). Likewise, contrary to the facts of **Barkley**, in which the defendant was suddenly confronted with a warning sign and wet new asphalt, a condition that deserved immediate remedial action, in today's case, Slayden had been engaged in similar conduct under similar conditions for possibly fifty or sixty miles. Judge Southwick's independent research also revealed that "[n]o Supreme Court opinion in the over-twenty years since **Barkley** was decided applied it to find that someone was negligent as a matter of law." **Id.** at *16, ¶23. This poignant fact goes not unnoticed by us, and we see no reason to apply **Barkley** to this record to reverse the trial judge's denial of Tentoni's peremptory instruction.

¶22. **Shields v. Easterling**, 676 So. 2d 293 (Miss. 1996), involved a one-vehicle accident in which a truck pulling a U-Haul trailer hit a patch of ice on a bridge, causing the truck momentarily to slide. The truck driver regained control and reduced his speed; however, a few miles down the road the truck hit another patch of ice, causing the truck and trailer to jackknife and then flip, resulting in injuries to one of the passengers. Likewise in **Shields**, a case resulting in a jury verdict for the defendant, this Court found that the trial court properly denied the plaintiff's peremptory instruction since the record established that it was a jury question as to whether the truck driver's speed caused the accident. **Id.** at 295.

¶23. The Court of Appeals, in the case *sub judice*, found **Shields** to be distinguishable, stating that the truck driver in that case "recognized that the bridges were icing over and took

precautionary measures. Since he had a minor incident, he slowed down. It was a jury question as to whether it was reasonable for him to foresee that he would nevertheless have a major incident at the slower speed he chose. In the case *sub judice*, however, Slayden recognized the danger but did not slow his speed." **Tentoni**, 2006 Miss. App. LEXIS 914, *6 (¶9). The "danger" to which the Court of Appeals was referring was "the danger[] of hydroplaning." *Id.* at *5 (¶7). However, the danger of hydroplaning always is present for all motorists traveling in the rain on a heavily-traveled highway such as Interstate 55. In today's case, the record reveals that Slayden may have been trailing Tentoni for as many as fifty to sixty miles, presumably at a fairly constant rate of speed, without incident. Under the circumstances then and there existing, as revealed in the record, we know of no reason for Slayden to believe he suddenly would hydroplane. Given the other options of either speeding up to what he believed to be an unsafe speed in order to pass Tentoni, or dropping back behind the eighteen-wheeler and enduring the heavy spray generated by the tractor-trailer rig, Slayden's decision to maintain the status quo and remain beside Tentoni in the left-hand, south-bound lane of Interstate 55 was not an unreasonable act, as obviously found by the jury in its verdict.[12] Thus, we find **Shields** to be applicable to our case today.

¶24.    Likewise, in **Shields**, we approved an "unavoidable accident" jury instruction similar to Jury Instruction No. 8 (submitted as instruction no. D-12A) which the trial judge granted

---

[12]Since the Court of Appeals opined Slayden should have reduced his speed, we are left with the unanswered question of how much Slayden should have reduced his speed to avoid hydroplaning.

15

in today's case. *Shields*, 676 So. 2d at 296. Also in *Shields*, this Court cited our prior decision in *McCollum v. Randolph*, 220 So. 2d 310, 312 (Miss. 1969). In *McCollum*, we stated:

> Appellants next complain of a jury instruction granted at appellee's request which is referred to in the brief as an "unavoidable accident" instruction. A reading of this instruction reveals that it correctly informs the jury that its verdict should be for the defendant if it should find from the evidence that the defendant had been guilty of no negligence which had proximately caused or proximately contributed to the injury and death of [decedent].
>
> The instruction concludes by saying that in such an event (a factual finding by the jury that no negligence on defendant's part had proximately caused or contributed to the injury and death) the occurrence, insofar as the defendant was concerned, was an unavoidable accident for which he was not liable. We do not think the instruction incorrectly stated the applicable law nor that it was capable of misleading the jury, especially when read with the rather liberal instructions granted appellants which submitted to the jury all of the theories of negligence relied upon for recovery.

*Id.* at 312.

¶25. Finally, being firmly convinced, for the reasons stated, that the trial judge properly allowed the jury to resolve the issues of negligence and liability, based on the evidence before the jury and the applicable law, and remembering always, as the jury was instructed in this case, that the jury had the "prerogative to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case," (Instruction No. 1 [C-1]), we are again reminded of what this Court stated in *Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983). Even though these words were directed toward the chancellor, sitting as the fact-finder without a jury, they certainly are applicable to any and all fact-finders, whether judge or jury:

16

[As to] the matter of the credibility of the testimony of [the witnesses], [t]he trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable."

*Id.* at 708. Likewise, the jury in our case today had the opportunity to hear the testimony of the various witnesses, and also to observe their demeanor. This was certainly true as to Warren Slayden; and this was certainly true as to Jackie Tentoni.

¶26. For all these reasons, we find that the trial judge did not err in denying the plaintiff's peremptory instruction on the issues of negligence and liability. We thus find no merit in this issue.

## II. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE OR A PRODUCT OF BIAS, PASSION AND PREJUDICE.

¶27. Our cases are legion as to how we must review this issue:

In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.

*Walmart Stores v. Frierson*, 818 So. 2d 1135, 1143 (Miss. 2002) (quoting *Herrington v. Spell*, 692 So. 2d 93, 103 (Miss. 1997)). *See also* *Lift-All Co., Inc. v. Warner*, 943 So. 2d 12, 15-16 (Miss. 2006) (citing *Blossman Gas, Inc. v. Shelter Mut. Gen. Ins. Co.*, 920 So. 2d 422, 424 (Miss. 2006); *Upchurch v. Rotenberry*, 761 So. 2d 199, 204 (Miss. 2000)). Also, a new trial may be granted when the trial court, or the appellate court on appeal,

17

determines that "'the jury has departed from its oath and its verdict is a result [of] bias, passion, and prejudice.'" *Hamilton v. Hammons*, 792 So. 2d 956, 965 (Miss. 2001) (quoting *Bobby Kitchens, Inc. v. Miss. Ins. Guar. Ass'n*, 560 So. 2d 129, 132 (Miss. 1989) (citing *Griffin v. Fletcher*, 362 So. 2d 594, 596 (Miss. 1978)). *See also Clayton v. Thompson*, 475 So. 2d 439, 443 (Miss. 1985). A trial judge's denial of a motion for a new trial will be reversed only upon a finding of abuse of discretion. *Hamilton*, 792 So. 2d at 965.

¶28. Tentoni argues that the jury was distracted from fairly and impartially deciding the issues presented because of certain improper and prejudicial statements made by Slayden's counsel during closing arguments. Counsel for Slayden stated the following:

> I will be the first one to acknowledge that I was a little bit harsh on Jackie Tentoni yesterday. I know I made some snide comments that I probably shouldn't have and I know I went on way too long. And I apologize for that.
>
> But here's the problem and here's why. This has been going for [the Slaydens] for six years. For six years, he has been carrying this burden and all the uncertainty and insecurity and stress that has been going along with this. He's survived two heart attacks. And he's sitting there with Nitroglycerine in his pocket right now. But he came here and he testified because he wanted you to know the truth.
> . . . .
> [Slayden] has been the object of [Tentoni's] fixation and her obsession for six years. We ask that you return a verdict in his favor today and set him free from that at long last.

On the other hand, Tentoni concedes in her brief that "[w]hile highly objectionable, no objection was made by [Tentoni's] counsel," which precludes a party from arguing the issue on appeal. Further, Tentoni argues that the comments were so prejudicial that this Court must reverse even absent objection. However, Tentoni fails to cite any relevant authority,

18

and thus, we are not obligated to review this issue on appeal. *Huff-Cook, Inc. v. Dale*, 913 So. 2d 988, 991 (Miss. 2005) (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998)).

¶29. Procedural bar notwithstanding, this issue is without merit. In *Eckman v. Moore*, 876 So. 2d 975 (Miss. 2004), we reiterated the familiar premise that in order to determine if a lawyer has made remarks in arguments to the jury which are so egregious as to require reversal, the test is "'whether the natural and probable effect of the improper argument . . . create[s] an unjust prejudice against the [opposing party] result[ing] in a decision influenced by the prejudice so created.'" *Id.* at 986 (quoting *Davis v. State*, 530 So. 2d 694, 701-02 (Miss. 1988)). In *Eckman*, we likewise stated:

> While an attorney making a closing argument may not make remarks which are unfairly calculated to arouse passion or prejudice, and while we do not condone appeals to sectional prejudices of the jury, the control of such argument is left largely to the discretion of the trial judge, who is in a much better position to observe and determine what is improper.

*Id.* at 986 (quoting *James W. Sessums Timber Co. v. McDaniel*, 635 So. 2d 875, 882 (Miss. 1994)).

¶30. The Court of Appeals understandably was not required to discuss this issue at length since that court was remanding the case for a new trial, but the Court of Appeals did find that such conduct exhibited by these remarks should not be repeated upon remand. While we agree that these comments would have been better left unsaid, a fact conceded by Slayden's counsel, we are firmly convinced that any error in making these statements to the jury was harmless. The trial judge in today's case dutifully instructed the jurors as to their solemn

19

oaths to follow the law as given by the trial court via the instructions, including Instruction No. 1 (C-1), which informed the jury that it was to base its decision on the evidence and the law, and that the evidence "consists of the testimony and statements of the witnesses, any stipulations made by the attorneys, and any exhibits admitted into evidence;" that the jury was "to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified;" and that the jury was not to "be influenced by bias, sympathy or prejudice." Also, in Instruction No. 19, (C-4), the trial court informed the jury, *inter alia*, that "arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but they are not evidence," and that "[i]f any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark." From the totality of the record, there is no indication that the jury in any way disregarded the trial court's instructions or was guided by blind passion or prejudice to render a defendant's verdict which it otherwise would not have returned.

¶31.    In sum, "[i]n a motion for a new trial, this Court will overturn the verdict only when it is against the overwhelming weight of the evidence." *Poole v. Avara*, 908 So. 2d 716, 727 (Miss. 2005) (citing *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005)). Stated differently, we will not set aside a jury's verdict and order a new trial unless we are convinced that the verdict was contrary to the substantial weight of the evidence that justice requires that a new trial be granted. *Id.* (citing *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 714 (Miss. 1984) (Robertson, J., specially concurring)). We are not convinced that the comments of Slayden's

20

counsel, although objectionable, were so prejudicial as to require a new trial; therefore, we find this issue to be without merit.

## CONCLUSION

¶32. For the reasons stated, we reverse the judgment of the Court of Appeals, and reinstate and affirm the Madison County Circuit Court's judgment entered consistent with the jury verdict in favor of the defendant, Warren W. Slayden, and against the plaintiffs, Jackie Tentoni, individually and as next friend on behalf of her minor children, Melanie Tentoni, Johnathan Tentoni and Phillip Tentoni.

¶33.   **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED**.

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶34. Because I believe the Court of Appeals correctly held that the trial court erred in refusing to grant a peremptory instruction[13] to the plaintiff on the issue of liability, I respectfully dissent.

¶35.   The evidence presented at trial establishes that the defendant was traveling at approximately sixty-eight miles per hour when he hydroplaned.  The evidence also

---

[13]The plaintiff in this case requested and was denied a peremptory instruction on the issue of liability at the close of all the evidence.  The proper procedure would have been for the plaintiff to move for a directed verdict.  *See* Miss. R. Civ. P. 50(a); *see also* **White v. Miller**, 513 So. 2d 600, 602 n.2 (Miss. 1987) (citation omitted).

21

establishes that it was raining at the time of the accident. Although it is not clear how heavy the rainfall was, it appears undeniable that there was a significant amount of rainfall both before and at the time of the accident. The defendant felt it necessary to drive behind the plaintiff's vehicle to avoid standing water on the roadway. The plaintiff testified that just before the accident she felt water under her vehicle and shifted gears to get extra traction. Moreover, the defendant testified that the tractor-trailer was "blowing water all over the top of [his vehicle]" as he passed it.

¶36.    The fundamental question is whether the defendant complied with his duty "to take reasonably proper steps to avoid an accident or injury to persons and property after having knowledge of the danger" of hydroplaning. *Shideler v. Taylor*, 292 So. 2d 155, 157 (Miss. 1974). The defendant clearly was well-aware of the danger of hydroplaning. However, in spite of his knowledge of that danger, he took no "steps to avoid an accident." Instead, the defendant chose to drive at a speed of sixty-eight miles per hour and, as a result, hydroplaned.

¶37.    Considering all of the evidence presented at trial in the light most favorable to the defendant, and giving him the benefit of all favorable inferences that may reasonably be drawn from the evidence, the facts and inferences point so overwhelmingly in favor of the plaintiff that reasonable jurors could not find for the defendant on the issue of liability. *Burnham v. Tabb*, 508 So. 2d 1072, 1074 (Miss. 1987) (citations omitted). There simply is no way of getting around the fact that the defendant decided to maintain a speed of sixty-eight miles per hour under very poor driving conditions. By refusing to decrease the rate of

22

speed at which he was driving, the defendant failed to take the only step that could have been taken to avoid an accident. Accordingly, I would hold that the plaintiff was entitled to a directed verdict.

¶38. Unlike the majority, I do not find the case of ***Barkley v. Miller Transporters, Inc.***, 450 So. 2d 416 (Miss. 1984), to be distinguishable from the present case. The majority asserts that ***Barkley*** is distinguishable because the driver of the tractor-trailer in ***Barkley*** passed a road sign warning drivers that the "upcoming stretch of road was slippery when wet." *Id.* at 417. It certainly is true that the defendant in this case was not made aware of a specific driving hazard by a road sign, as was the negligent driver in ***Barkley***. However, that factual difference alone does not distinguish ***Barkley*** from the present case.

¶39. The defendant in the present case was just as cognizant of the danger of hydroplaning as the driver in ***Barkley*** was of the danger posed by the wet, freshly-laid asphalt. Like the driver in ***Barkley***, he appreciated the risk of losing control of his vehicle, but took no steps to avoid an accident. Both drivers chose not to reduce the rate of speed at which they were traveling in response to the dangerous driving conditions that existed at the time of their respective accidents. If anything, the defendant's conduct in this case was more negligent than that of the truck driver in ***Barkley***.

¶40. First, the defendant in this case was traveling at sixty-eight miles per hour, whereas the driver of the tractor-trailer was driving at only approximately fifty miles per hour. ***Tentoni v. Slayden***, 2006 Miss. App. LEXIS 914 *13 (¶20) (Southwick, J., dissenting). Second, he was traveling at that higher rate of speed under much worse driving conditions

23

than the truck driver in **Barkley**. At the time the accident occurred in this case, a significant amount of rain was falling. When the driver in **Barkley** lost control of his truck, the road was wet, but it was not raining. **Barkley**, 450 So. 2d at 417.

¶41.    It appears that the Court in **Barkley** concluded that the granting of a peremptory instruction was proper because the driver of the tractor-trailer did not reduce his speed after becoming aware of the slick asphalt that lay ahead. **Id.** at 420; **Tentoni**, 2006 Miss. App. LEXIS at *15 (¶22) (Southwick, J., dissenting) ("both in **Barkley** and here the only possible negligence arises from the defendants' speed"). Because of the similarity between the facts of the two cases, I would adhere to the Court's analysis in **Barkley** and hold that the defendant was negligent as a matter of law in not reducing his speed.

¶42.    I also am not persuaded by the majority's reliance on **Shields v. Easterling**, 676 So. 2d 293 (Miss. 1996) in reaching its conclusion that the denial of the plaintiff's request for a peremptory instruction was proper. **Shields** is distinguishable because the defendant in that case took steps to avoid an accident, while the defendant in this case did not. After hitting "a patch of ice on a bridge" and slightly losing control of his vehicle, the defendant in **Shields** "slowed his speed to approximately forty to forty-five miles per hour." **Shields**, 676 So. 2d at 294. After taking this precautionary measure, the defendant hit another patch of ice and jacknifed. **Id.** By contrast, the defendant in this case never reduced his rate of speed, despite the fact that he was driving under treacherous conditions. Therefore, **Shields** should not instruct the Court's decision on whether the trial court correctly denied the plaintiff's request for a peremptory instruction.

24

¶43. For the foregoing reasons, I would affirm the judgment of the Court of Appeals, reverse and render as to liability and remand the case to the trial court for a new trial on damages.

**GRAVES, J., JOINS THIS OPINION.**