# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 2, 2010

Charles R. Fulbruge III
Clerk

No. 08-61115

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JOE LEWIS COLLINS,

Defendant - Appellant

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 06-CR-00024

---

Before KING, BARKSDALE, and ELROD, Circuit Judges.

PER CURIAM:[*]

Joe Lewis Collins was convicted by a jury of conspiracy to commit murder and murder of a government witness under 18 U.S.C. § 1512(a)(1)(A) and (k). On this direct appeal, he challenges his convictions based on two evidentiary rulings. As to the first ruling, we find no error. As to the second ruling, we assume without deciding that error was committed, but we conclude that any error was harmless. AFFIRMED.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 08-61115

## I. BACKGROUND

"We recite the facts in the light most favorable to the verdict." *United States v. Olis*, 429 F.3d 540, 541 n.1 (5th Cir. 2005). Levon Edmond and Kathleen Nelson (who are sisters), along with Nelson's boyfriend Roosevelt Walker and their mutual friend Joe Lewis Collins (the appellant in this case), were involved in a fraud conspiracy. The four forged settlement claims and recruited false claimants under the Pigford–Glickman litigation.[1] Once the false claimants received settlement checks, Edmond, Nelson, Walker, and Collins would take a cut of the money. Clovis Reed, one of their recruits, received a $50,000 settlement check in March 2001, but Edmond and Nelson stole the check. Reed reported the check as stolen, and the FBI started an investigation. Edmond and Nelson were indicted in February 2003 on federal charges of forgery and conversion of Reed's check, and Reed was to be the key witness for the prosecution. However, before the case could proceed, Reed was murdered.

As she drove home from work on the evening of April 2, 2003, Reed was ambushed, allegedly by Walker and Collins. Broken glass, matching that from a broken window in Reed's car, was found along the route from her job to her home in Canton, Mississippi. Her body was discovered in a secluded, wooded area, approximately 50 miles south of Canton, on April 4 by Luther Crownover, a beekeeper who was checking his hives. Her head and hands had been cut off, and they were never recovered.

The FBI investigated Reed's death and eventually charged Edmond, Nelson, Walker, and Collins with her murder. Edmond pled guilty to conspiracy to murder a government witness and, in exchange for a twenty-five year

---

[1] This class action litigation involved claims by African–American farmers, who were denied loan approval by the United States Department of Agriculture on a racially discriminatory basis. *Pigford v. Glickman*, 206 F.3d 1212, 1213–16 (D.C. Cir. 2000). Under the settlement agreement, if claimants met certain criteria, they were eligible to receive up to $50,000. *Id.* at 1215.

No. 08-61115

sentence, agreed to testify against her co-conspirators. After a joint trial, Nelson and Walker were convicted; both received life sentences.[2] Collins was indicted for one count of conspiracy to commit murder, under 18 U.S.C. § 1512(k), and one count of murder of a government witness, under 18 U.S.C. § 1512(a)(1)(A). At the jury trial, the main issue was whether the prosecution could link Collins to Reed's death, as he did not dispute the cause of her death. Edmond testified that Collins came up with the idea to kill Reed in order to prevent exposure of the fraud scheme, admitted on several occasions he killed Reed by strangling her with his belt, and bragged about amputating Reed's head and hands. Collins was convicted on both counts and received two life sentences.

On appeal, Collins raises two evidentiary issues. First, he challenges the admission of six photographs of Reed's body where it was discovered and during the autopsy. Second, he contends that Edmond was improperly allowed to testify that Collins used a particular cell phone without first establishing her basis of knowledge.

## II.  STANDARD OF REVIEW

As Collins properly objected at trial to both evidentiary issues, on appeal we review for abuse of discretion. *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007). "A trial court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Caldwell*, 586 F.3d 338, 341 (5th Cir. 2009). Should we find an abuse of discretion has occurred, we conduct a harmless error analysis and affirm unless the error affected Collins's substantial rights. *United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005); *see also* FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). An error affects substantial rights if it affects the

---

[2] This court affirmed those convictions and sentences in *United States v. Nelson*, 242 F. App'x 164 (5th Cir. 2007).

3

outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 734 (1993). The Government bears the burden of showing that any error was harmless beyond a reasonable doubt. *Id.*

## III. DISCUSSION

### *A. Photographs*

During the Government's case-in-chief, the prosecutor offered six photographs of Clovis Reed's body—two at the site where it was discovered, and four at the autopsy. The district court admitted all six photographs over Collins's objections based on Federal Rule of Evidence 403 (Rule 403). Collins argues that the six photographs of Reed's dismembered body lacked relevance because he offered to stipulate to all the facts reflected in the photographs and the photos therefore offered no information in addition to facts already offered through live testimony. Collins argues that their prejudicial effect therefore substantially outweighed any probative value and the trial court abused its discretion in admitting them. The district court did not conduct a Rule 403 balancing analysis on the record; however, Collins did not request one. *See United States v. Alarcon*, 261 F.3d 416, 424 (5th Cir. 2001) ("Normally, the trial court must explicitly perform [the Rule 403 balancing] analysis on the record; however, if the party objecting to the admission fails to request the analysis, the trial court need not perform it on the record." (citation omitted)).

### 1. The Legal Standard

Rule 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or . . . needless presentation of cumulative evidence." FED. R. EVID. 403. The scope of Rule 403 is quite narrow, *Fields*, 483 F.3d at 354, and it is "not designed to 'even out' the weight of the evidence." *Baker v. Canadian Nat'l / Ill. Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008); *see also* FED. R. EVID. 401 advisory committee's note ("The fact to which

the evidence is directed need not be in dispute."). In the Fifth Circuit, "admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value." *Fields*, 483 F.3d at 355. "On appellate review of a Rule 403 decision, a defendant must establish abuse of discretion, a standard that is not satisfied by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon." *Old Chief v. United States*, 519 U.S. 172, 183 n.7 (1997).

In *Old Chief*, the Supreme Court stated that "[i]f . . . relevant evidence is inadmissible in the presence of other evidence related to it, its exclusion must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its relevance notwithstanding." 519 U.S. at 179. Although when "one party stipulates to a disputed fact, the stipulation conclusively proves that fact," *Caldwell*, 586 F.3d at 342, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force" of the Government's case, *Old Chief*, 519 U.S. at 186. The Government is faced with a "need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be," and because the Government bears the burden of proof, it "may prudently demur at a defense request to interrupt the flow of evidence telling the story in the usual way." *Id.* at 188–89.

We addressed a similar set of facts in *United States v. Caldwell*. 586 F.3d at 342–43. There, a defendant charged with possession of child pornography argued that the publication of several brief excerpts from child pornography videos found on his computer was unfairly prejudicial, as he offered to stipulate that the videos contained child pornography. *Id.* at 342. We rejected that argument, concluding that *Old Chief* "turn[s] on the contribution of the challenged evidence to the overall narrative of the Government's case." *Id.* at

343. Because "child pornography is graphic evidence that has force beyond simple linear schemes of reasoning," the language of the stipulation did not have the same evidentiary value as "actually seeing the particular explicit conduct of the specific minors." *Id.*

We also addressed similar facts in *United States v. Fields*, where we considered a Rule 403 challenge to thirty-two photographs of a murder victim's body, both at the site where it was discovered and during the autopsy. 483 F.3d at 354. We concluded that the photographs were "highly probative" and "necessary to rebut [the defendant's] arguments" that the Government failed to produce any physical evidence linking him to the crime. *Id.* at 355. The crime scene photos showed the body "in an advanced state of decomposition and . . . subject to animal predation"; they helped "explain why little physical evidence was found: because it had been carried away by animals or worn away by the elements." *Id.* at 354, 355. The crime scene photos also corroborated witness testimony that the defendant admitted dragging the victim's body. *Id.* at 355. The autopsy photos "helped the jury understand the medical examiner's testimony" and supported the Government's theory on the cause of death. *Id.* at 355–56. We rejected the defendant's contention that several individual photos should have been excluded because "some of the points made by the photos were not in dispute," concluding that the Government needed the photographs to demonstrate "that the body had decomposed too much for any physical evidence to be found," a point made "more effectively with images than it would have been with vague generalizations about the difficulty in processing weeks-old crime scenes." *Id.* at 356. We also declined to engage in "strict scrutinizing" of the district court's Rule 403 decision. *Id.*

### 2. Probative Value of Crime Scene Photos

The two crime scene photographs depict information valuable to the Government's case; they clarify oral testimony and illustrate the condition of

Reed's body and the scene where her body was left. The first photograph depicts the body lying in a clearing surrounded by a wooded area. It is difficult to tell that the photo depicts a human body, as Reed's head and hands have been removed. The second photograph shows a close-up of the body, and the individual wounds are more clearly visible.

These two photos were first admitted during Luther Crownover's testimony. Crownover, a beekeeper, discovered Reed's body; in his testimony, he referred to the photos as he described the discovery and where the body was located. Crownover testified that he observed "what [he] assumed was an animal carcass . . . that someone had started butchering" across the fence from a line of his bee hives. He related that he approached the carcass because he thought it was "going to attract flies and birds and was going to be a problem . . . with the odor for several weeks probably," so he "climb[ed] over the fence and [went to] go see if [he] could move it further into the woods." However, once he approached and bent over the carcass, he realized it was a human body. While looking at the two photos, Crownover testified that Reed's body was only clothed in underwear at the time of discovery, although he did not know it was underwear at the time. He testified that he "thought it was possibly just a rag or something someone had used to drag this carcass out, because at that time [he] still didn't know it was a human body." He stated that the second photo in particular reflected the condition of Reed's body at the time he discovered her. Crownover also testified that the area, flat and marshy, had once been an old farm road for wagons and that there were no homes within a quarter mile or more.

Donnie McGovern, the Simpson County Sheriff's Office investigator who responded to Crownover's 911 call, also testified about the two photographs. McGovern identified the photos as depicting "the body that was reported . . . by Mr. Luther Crownover," and he stated that the body was located down a trail,

194 feet to the east of Old River Road (a paved street), and about fifteen feet north of a deer stand. He used the second photo to indicate where the deer stand was located in relation to the body. He also testified that while the trail was visible from Old River Road during daytime hours, the trail would not be visible at night and the body was not visible from the road.

Like in *Fields*, the two photographs help explain why no physical evidence was found linking Collins to the murder—a point Collins repeatedly leaned on at trial. The photos show that Reed's body was left outside, in the elements, in only her underwear. Whoever committed the crime had removed the clothing and the parts of Reed's body most likely to retain traces of physical evidence. The two photographs also corroborate the medical examiner's testimony that Reed was killed at another location and then dumped on the trail, as there was only a small amount of blood at the dump site. While the probative value of the two crime scene photographs either was or could have been brought out through testimony at trial, we have consistently held that "[t]he fact to which the evidence is directed need not be in dispute," and Rule 403 "does not ban *per se* all duplicative evidence." *Fields*, 483 F.3d at 356 (citations and internal quotation marks omitted). The two crime scene photos have nontrivial probative value.

### 3. Probative Value of Autopsy Photos

The four autopsy photographs also convey information vital to the Government's case. All four photos helped the jury understand the medical examiner's testimony regarding the results of the autopsy. In particular, one photograph depicts a broad view of Reed's upper back, neck, and left arm. The decapitation wound is the focus of this photo. Distinct cut marks are visible; the wounds have a slight green discoloration; and the deepest wound shows significant maggot larval infestation. Small bits of leaves, grass, and dirt are visible on her back, and her upper back shows scrape marks. This photo was

introduced as Dr. Hayne, the medical examiner, testified as to his findings on the cause and time of death.

This photo helped illustrate the condition of Reed's body and why Dr. Hayne could not reach a more definite finding as to the cause of death.  Dr. Hayne testified that, following the autopsy, he "favored cranial cerebral trauma" as the cause of Reed's death but could not come to a "definitive conclusion[ ]." He explained that, other than her head and hands, Reed's body was intact; as a result, he "reasonably excluded any other cause of death."  He "did not see evidence that [would allow him to] conclude that strangulation had occurred," and he felt that injury to the head was the most likely cause of death.  Dr. Hayne stated that the "multiple abrasions or scrapes of the skin . . . [,] linear in configuration [were] indicative of a body being dragged."  Because of the "significant maggot larval infestation," the "minimal green discoloration" in the wounds, and the lack of "significant skin slippage"—all visible in the autopsy photo—Dr. Hayne set the time of death at around 36 to 48 hours prior to the amputation of Reed's head and hands.  He also opined that the amputations occurred post-mortem, because no significant hemorrhage or bleeding was present in the injured tissue.  The fact that Dr. Hayne's testimony was largely uncontested does not rob it of its relevancy or its importance to the Government's case.  *See United States v. Bowers*, 660 F.2d 527, 530 (5th Cir. Unit B Sept. 1981) (per curiam) ("[T]he mere fact that [a defendant] stipulate[s] with the government as to the cause of death [does] not preclude the government from offering proof on that issue.").  The first autopsy photo clearly has non-trivial probative value to the Government's case.

Three other autopsy photos show Dr. Hayne comparing Reed's wounds to a Kaiser blade.  The Government offered these three photos to support and explain Dr. Hayne's testimony that he believed that a Kaiser blade was the weapon used to decapitate Reed.  He testified that he reached this conclusion

because this type of blade has a "nonsharpened [sic] edge" but still had "mass to it or weight to deliver enough force to produce these injuries." According to Dr. Hayne, the three photos demonstrate "the potential correlation between a weapon such as a Kaiser blade and the inflicted injuries on the decedent." Specifically, the photos reflected Dr. Hayne's conclusion that "the curvature and the depth" of the wounds matched the type of injuries that a Kaiser blade might inflict.[3] Dr. Hayne also opined that "it would take a considerable amount of force to inflict [the] type[] of injuries" suffered by Reed, and that he favored a man, rather than a woman, as the perpetrator.

At trial, Collins objected to Dr. Hayne's testimony on the probable correlation between the Kaiser blade and the wounds on relevancy grounds, as the state did not offer any evidence linking Collins to a Kaiser blade. However, the district court overruled the objection, and Collins does not appeal that ruling. Collins contends that these three comparison photographs are irrelevant because they depict post-mortem injuries, not related to the cause of death. However, the comparison photos clearly help explain Dr. Hayne's testimony—unchallenged on appeal—regarding the correlation between the wounds and the Kaiser blade. As such, the photos have nontrivial probative value.

### 4. Prejudicial Effect

Collins argues that the admission of the six photographs unfairly prejudiced the jury against him. While all six photographs are, in fact, shocking and gruesome, the district court acted within its discretion by admitting them into evidence. The "general, conclusory language of [a] stipulation" to the facts and circumstances of Reed's murder and the disposal of her body "does not have

---

[3] On cross-examination, Dr. Hayne clarified that the photos comparing the wounds and the Kaiser blade did not have anything to do with the cause of death, as the amputations occurred post-mortem. He also indicated that the specific Kaiser blade shown in the photos had not been in any way linked to or used in Reed's murder.

the same evidentiary value as actually seeing the particular" crime scene and the condition of the body. *Cf. Caldwell*, 586 F.3d at 343. The photographs are graphic evidence with force beyond simple linear schemes of reasoning. Within reasonable limits, the prosecution is entitled to present its case through the evidence it deems most appropriate. *See Old Chief*, 519 U.S. at 187–88. Furthermore, the district court's questions to the jury panel during voir dire[4] and the instructions to the audience[5] helped to limit any prejudicial impact. Collins argues extensively that "this specific photo or that specific photo was used to make points that might also have been made with other evidence or with another specific photo"; however, we cannot engage in "strict scrutinizing . . . when reviewing a trial court's Rule 403 balancing decision." *Cf.*

---

[4] During jury selection, the judge asked prospective jurors:

whether [they could] look at all the evidence to determine whether the accused is guilty of the crime charged and not move by passion solely because of the condition of an exhibit to determine that he must be guilty or that you want him to be guilty because of the condition of the deceased's body as evidenced by an exhibit, that you would look at all of the evidence and determine if the government has proved its case against the accused by proof beyond a reasonable doubt that he was involved to the extent that the government says and that you are not moved . . . to a verdict of guilty solely because of any passion that an exhibit might cause.

Defense counsel also asked a similar line of questions, informing the jury panel that:

You're also going to have to look at some really graphic, again, horrible pictures of Ms. Reed's body. . . . [T]hey're very graphic and they're hard to look at. Does anybody think they're going to have a problem being fair and impartial because of not only the horrible nature of the crime, but what happened after the murder and the condition and the pictures you're going to have to look at?

All the jurors chosen for the panel indicated that they would not let their reactions to the photographs affect their impartiality.

[5] During trial, before showing the photos of the body at the dump site, the district court excused the jury and warned the gallery:

The prosecutor will now put on the screen a photograph of the victim's body when found. For family members [or] members [of] the audience who might become impassionate [sic] at seeing this sight, then I advise you that you should leave the courtroom during this occasion because the court does not wish to have any outburst. So, then, those of you who might feel impassioned at the sight of these photographs should leave the courtroom.

No. 08-61115

*Fields*, 483 F.3d at 356. Given the deference required by the standard of review, we find that any prejudicial effect did not substantially outweigh the nontrivial probative value of the six photographs; therefore, the trial court did not abuse its discretion in admitting the photos.

### B. *Testimony About the Cell Phone*

At trial, the Government's case turned on whether they could successfully link Collins to Reed's murder—a link that relied in large part upon circumstantial evidence. In particular, the Government presented evidence on the location of four cell phones on April 2 and 3, 2003. Three of the cell phones were clearly linked to Edmond, Nelson, and Walker—each one's name was registered to the phone in the phone company's records. The fourth phone was a demonstration phone that Nelson had stolen from a Sprint store; phone company records did not list a registered owner. Using phone records and information from cell phone towers, the Government showed that the four cell phones placed numerous calls amongst each other throughout the night of April 2 and into the morning of April 3. The locations and times of the calls roughly corresponded to the locations where Reed was attacked and her body was abandoned. In particular, the fourth phone moved from the area where Reed's car window was broken (around 1:40 a.m.), to the area where Reed's body was recovered (between 3:15 and 3:30 a.m.), and then to the area around the InTown Suites in Jackson, Mississippi, where Collins was staying (around 5:15 a.m.). After 5:15 a.m. on April 3, the fourth phone was not used again for two weeks.

Edmond testified on direct examination that she knew Collins had used the fourth phone, but that she did not know whether he used the phone on the night of the murder. The exchange on direct examination went as follows:

Q: [by prosecutor] How are you familiar with a stolen Sprint phone?

A: It was a cell phone that my sister, Kathleen, took from the Sprint store.

12

No. 08-61115

Q: [by defense counsel] I object.  Your Honor, I'm going to object unless there's a basis of knowledge laid.

Q: [by prosecutor] How would you know Kathleen took a phone from the Sprint store?

A: I was with her when she took it.

Q: Okay.  *And what happened to that phone, if you know?*

A: *She had that phone that night, but I don't know exactly, you know.*

Q: *Do you know who might have used that phone?*

Q: [by defense counsel] Again, objection unless there's a basis—

A: Mr. —

THE COURT: I sustain the objection.  I sustain the objection to the form of the question "might have used."

Q: [by prosecutor] *Do you know who used that phone?*

A: Mr. Joe —

Q: [by defense counsel] Same objection, your Honor.

THE COURT: She can answer.

A: *Mr. Collins.*

Q: [by prosecutor] Okay.  *But you don't know if he had it that night.*

A: *I can't say.*

Q: All right.

Q: [by defense counsel] Your Honor, I want to move to strike her answer earlier because there's been no basis of knowledge for her earlier answer.

THE COURT: I'll let you cross-examine on that point.

(emphases added).  Defense counsel did not cross-examine Edmond on the basis for her knowledge. Collins argues that the district court abused its discretion in allowing this testimony, as the Government failed to establish that Edmond had personal knowledge that Collins had used the fourth phone.  At oral argument, Collins clarified that he challenges Edmond's basis of knowledge that he used

the fourth cell phone between the time Nelson stole it and the night of Reed's murder, and he argues he was prejudiced because without the testimony linking him to the phone, the evidence regarding the location and movement of the four cell phones would not have come in.

Rule 602 states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the witness'[s] own testimony."  FED. R. EVID. 602.  The proponent of testimony bears the burden of establishing that a witness has personal knowledge.  *Burton v. Banta Global Turnkey, Ltd.*, 170 F. App'x 918, 923 n.4 (5th Cir. 2006).  "[A] witness to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact."  1 MCCORMICK ON EVIDENCE § 10 (5th ed. 1999).  However, the threshold for admitting testimony under Rule 602 is fairly low; if "reasonable persons could differ as to whether the witness had an adequate opportunity to observe, . . . the witness's testimony should come in, and the jury will appraise his opportunity to know in evaluating the weight of the testimony."  *Id.*

Arguably, Edmond had the opportunity to observe whether Collins used the fourth cell phone, as she, Collins, Walker, and Nelson were mutual friends and spent a lot of time together, especially in the weeks leading up to the murder.  However, assuming without deciding that the district court abused its discretion by allowing Edmond to testify that Collins had used the fourth cell phone *before* that night, that error was harmless, because it did not affect the outcome of the district court proceedings.  Edmond expressly stated that she did not know who used the phone on the night of the murder, and her testimony regarding his alleged prior use of the phone was brief and equivocal.

Where "other extensive evidence" supports the jury's verdict, an error does not affect a defendant's substantial rights.  *United States v. Cooks*, 589 F.3d 173,

14

180 (5th Cir. 2009); *United States v. Clark*, 577 F.3d 273, 288 (5th Cir. 2009) (finding that any evidentiary error would have been harmless "given the overwhelming evidence of [the defendant's] guilt"). Here, the record contained extensive circumstantial evidence that allowed the jury to infer that Collins used the fourth phone on the night of the murder and that he acted with Edmond, Nelson, and Walker in planning and carrying out Reed's murder. For example, the evidence from the phone records shows that the fourth phone was located directly in the vicinity of the InTown Suites, where Collins was staying, when the last call was made in the early morning of April 3. Edmond testified that she, Nelson, Walker, and Collins were all good friends. In fact, Edmond paid for Collins's room at the InTown Suites in the weeks leading up to Reed's murder, and Walker often stayed with Collins at the InTown Suites. Walker and Collins both initially told FBI investigators that they had been playing dominoes together on the night of the murder; however, both men eventually gave inconsistent statements that undercut the initial joint alibi. Collins also offered investigators a notebook with domino scores to support the claim that he and Walker had been in his room at the InTown Suites on April 2, but an FBI handwriting analyst determined that the date for the April 2 game had been altered—it was originally marked as April 3. Reed's body was recovered from an isolated location, approximately a mile and a half from a house where Collins lived for seventeen years.

In addition, the jury heard Edmond's testimony that Collins was involved in the fraud scheme; he hatched the idea to kill Reed to prevent her from testifying; he admitted to strangling Reed with his belt; he asked Edmond and Nelson to clean up Reed's car and gave them directions to the abandoned car; he and Walker dumped Reed's body off Old River Road; he bragged about cutting off Reed's hands and head and called himself the "Little Butcher"; he told Edmond, on the day the local news reported the discovery of Reed's body, not to

ask about the contents of a bag in the backseat of his car (which Edmond presumed contained Reed's head and hands); and he repeatedly exhorted the others to keep their stories straight and suggested alibis to tell the police.[6] *See United States v. Setser*, 568 F.3d 482, 494–95 (5th Cir. 2009) (finding improper admission of expert testimony was harmless error where government presented "considerable" evidence against defendant and where improper testimony only made up two lines of testimony in an extended trial). Where, as here, extensive evidence supports the jury's verdict, any error did not affect the outcome of the district court proceedings; Collins's substantial rights were not affected; and, therefore, any error was harmless.

### IV. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction below.

AFFIRMED.

---

[6] While Collins argues that Edmond's testimony is uncorroborated and self-interested, the jury determines credibility. Collins presented evidence of Edmond's plea agreement with the Government, and the jury was made aware of several instances where Edmond was caught in lies. As "[t]he jury is solely responsible for determining the weight and credibility of the evidence," *United States v. Casilla*, 20 F.3d 600, 602 (5th Cir. 1994), Collins's protestations that Edmond was unreliable do not prevent her testimony from being considered in our harmless error analysis.