# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-00640-SCT

*LEDARIUS BONDS a/k/a LE'DARIUS BONDS*
*a/k/a POO*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 04/05/2012 |
| TRIAL JUDGE: | HON. MICHAEL M. TAYLOR |
| TRIAL COURT ATTORNEYS: | RODNEY TIDWELL |
| | ROBERT BYRD |
| | PAUL LUCKETT |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 05/22/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     LeDarius Bonds was convicted of murder by a jury in the Pike County Circuit Court in April 2012 and sentenced to life in prison. Bonds appeals his conviction, arguing that the trial court erred in admitting Exhibit 39, a gruesome photograph that he contends was more prejudicial than probative, and that the trial court erred in allowing a jury instruction which

informed the jury that it could infer malice from the use of a deadly weapon. Finding that Exhibit 39 was far more prejudicial than probative, we reverse the conviction and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2.     The facts are taken from the Court of Appeals opinion.

LaJeremy Seabron went missing on August 27, 2010, after giving Bonds, his co-worker at the Sanderson Farms plant, a ride after work. After Seabron went missing, the police department received a call from Bonds, who told them that he was being threatened at work by Seabron's friends about Seabron's disappearance. Bonds initially told police that he did receive a ride home from Seabron, but he had not seen Seabron since then. On September 1, 2010, a burned vehicle registered to Seabron's mother was discovered. The following day, Seabron's decomposing body was discovered several miles away from the burned vehicle. An autopsy showed that Seabron died from a single gunshot wound to the back of the head.

On September 3, 2010, investigators interviewed Bonds. During this interview, Bonds told the investigators that Seabron was a member of a local gang. Bonds had repeatedly declined Seabron's invitations to join the gang, which according to Bonds, resulted in Seabron threatening to kill Bonds and calling him a snitch. Bonds further told the investigators that the men had worked out their differences. Bonds admitted that Seabron had given him a ride home after work on August 27, 2010, but Bonds stated that he had not seen him since that time, even though Seabron had planned to return to Bonds's apartment.

After investigators questioned this version of events, Bonds then told another version involving another car stopping them on the way home from work. The individuals in the other car took Seabron at gunpoint and threatened to kill Bonds or someone in his family. Bonds again changed his story. In this next version, Seabron pulled over on the roadside and told Bonds he wanted him to see something. According to Bonds, Seabron then approached him from behind and cocked a gun. A struggle ensued, and the gun discharged. Bonds was able to gain possession of the gun and shot Seabron in the back of the head. He then told investigators that he left Seabron in the automobile, but came back a day or two later to remove Seabron's body and move and burn the automobile. This portion of the story again changed to Bonds leaving Seabron on the ground after shooting him, driving the automobile away, hiding the gun, and then burning the automobile at another location. Bonds also led

2

investigators to Seabron's gun, which he claimed he hid in a vacant house after the incident. The gun, with a pearl-like handle, was recovered in the vacant house, and it had one spent shell casing and five live rounds. No fingerprints or ballistic data was able to be obtained from the gun or the bullet fragments recovered from Seabron's skull.

Several days later, Bonds requested to speak to investigators yet again. He changed his version of the events again. This time, Bonds stated that during the struggle, he was able to force Seabron's arm behind his back. This position put Seabron's hand holding the gun facing toward the back of Seabron's head. The gun discharged, shooting Seabron in the back of the head.

Bonds was indicted by a Pike County grand jury on May 5, 2011, for the murder of Seabron in violation of Mississippi Code Annotated section 97-3-19 (Rev. 2006). His jury trial began on April 3, 2012, and ended on April 5, 2012, with the jury finding him guilty of the murder of Seabron. In addition to Bonds's statements he made to the investigators, the jury heard testimony from several witnesses, including Bonds's roommate at the time, Brandon Hall. Hall testified that he usually gave Bonds rides to and from work; however, on August 27, 2010, Bonds told him he did not need a ride home from work that day because Seabron was going to give him a ride home. Hall also testified that when Bonds came home later that day, Bonds asked him to tell people that the last time he saw Bonds and Seabron together was at 4:30 p.m. on August 27, 2010. This was an untrue statement. According to Hall's testimony, Bonds told him that he had dumped Seabron's body and burned the car. Lastly, Hall testified that Bonds moved out of their apartment shortly after Seabron went missing. As Bonds was moving out, Hall said he had seen Bonds throw a gun over a fence near their apartment, and he had also seen a gun with a pearl-like handle in Bonds's room a few days before Seabron went missing.

In addition, the State presented the jury with several crime-scene photographs depicting the decomposing body of Seabron. Bonds's attorney objected to the introduction of the photographs. The circuit court overruled the objection and allowed several pictures into evidence; however, it also sustained the objection as to some pictures prohibiting their introduction into evidence.

After deliberations, the jury found Bonds guilty of the murder of Seabron. The circuit court sentenced Bonds to life in the custody of the MDOC. Bonds timely executed the current appeal.

***Bonds v. State***, 2013 WL 2996109, **1-2 (¶¶ 2-8) (Miss. Ct. App. June 18, 2013).

¶3. On appeal, Bonds argued that the trial court erred in admitting gruesome photographs of the victim's decomposing skull and body that were more prejudicial than probative. He also argued that jury instruction S-7, which instructed the jury that it could infer malice from the use of a deadly weapon, was given in error. The Court of Appeals held that the trial court did not abuse its discretion in admitting the photographs, because it carefully considered the potential prejudicial effect of each photograph admitted and found that several had evidentiary value. *Id.* at *3 (¶ 13). It also found that the jury instruction was not erroneous, as it merely allowed the jury to infer malice from the use of a deadly weapon, and did not instruct jurors to presume it, which would have shifted the State's burden of proof. *Id.* at *5 (¶ 17). The Court of Appeals, although noting that the State's brief was woefully inadequate, sloppy, and unprofessional,[1] affirmed Bonds's conviction and sentence. *Id.* at *5 (¶¶ 18-19).

¶4. In his petition for certiorari, Bonds essentially makes the same arguments, but focuses his claim of erroneous admission of prejudicial photographs on Exhibit 39, which showed a full-color, close-up, frontal view of the victim's decomposed face. He contends that this photograph had no evidentiary value and was used solely to inflame the passions of the jury.

---

[1]We share the Court of Appeals' disappointment in and disapproval of the State's brief. The statement of facts was three sentences long. It stated, "Defendant took a gun and shot his victim in the back of the heard [*sic*]. Defendant took the body and burned his victim's car. Defendant gave several statements to police which ultimately led to admitting his involvement in his victim's death." The conclusion clearly came from a different brief that the State did not bother to change. It states, "Based upon the arguments presented herein as supported by the record on appeal the State would ask this reviewing court to affirm the trial court order denying relief, revoking the post-release supervision and imposing the remainder of the suspended sentences." This is a direct appeal of a murder conviction and sentence and clearly has nothing to do with post-release supervision or suspended sentences. This brief is unprofessional and disrespectful to our state's appellate courts and the victim for whom the State seeks justice. Like the Court of Appeals, we expect much better.

He reiterates his argument that jury instruction S-7 was given erroneously. We granted Bonds's petition for certiorari, and we limit our review to the admission of evidence issue. M.R.A.P. 17(h).

## STANDARD OF REVIEW

¶5.     We review the decision to admit or exclude evidence under an abuse of discretion standard. ***Grim v. State***, 102 So. 3d 1073, 1078 (¶ 11) (Miss. 2012).

## ANALYSIS

¶6.     LaJeremy Seabron died as a result of a gunshot wound to the back of his head. This was not disputed at trial. What was disputed was how he was shot. The State argued that Bonds had shot Seabron in the back of the head. Bonds had told several different versions of his recollection of the events of that night. In one of the versions, he stated that Seabron maintained possession of the pistol, but his arm became pinned behind his back and, while so positioned, he accidentally shot himself in the head.

¶7.     The State sought to admit several photographs of Seabron's head, some of which showed the entrance wound to the back of the head. Bonds objected to the admission of the photographs at trial and offered to stipulate that the cause of death was a bullet wound to the back of the head. The trial court carefully examined the photographs and determined whether each one should be admitted based upon its relative probative value and prejudicial effect. It is the admission of one of the photographs, Exhibit 39, that Bonds contends was extremely prejudicial and requires reversal. Bonds argues that Exhibit 39, a full-color, close-up photograph of the front of Seabron's facial area, showing "decomposing skin falling off, a

dislocated mandible, and maggots crawling all around and in the vacant occipital orbits," was not probative of any material fact and was extremely prejudicial.

¶8.     This Court has held that a trial court must conduct a two-part test to determine whether a crime victim's photograph is admissible. "First, the trial court must determine whether the proof is absolute or in doubt as to identity of the guilty party. Secondly, it must be determined whether the photographs are necessary evidence or simply a ploy by the prosecutor to arouse the passion and prejudice of the jury." *Manix v. State*, 895 So. 2d 167, 178 (¶ 33) (Miss. 2005). Such photographs should not be admitted "where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." *Le v. State*, 913 So. 2d 913, 955 (Miss. 2005).

¶9.     This Court specifically has held that the admission of a "full-color, close-up view of the decomposed, maggot-infested skull" of the victim constituted reversible error. *McNeal v. State*, 551 So. 2d 151, 159-60 (Miss. 1989). There, the Court reversed a guilty verdict in a murder trial due to the admission of three gruesome photographs showing the victim's maggot-infested skull. *Id.* at 160. The Court noted that the photographs were "so graphic as to arouse the passion of the jury[,]" and that, "[w]ithout describing every morbid detail, it is sufficient to say that these are some of the most gruesome photographs ever presented to this Court." *Id.* at 159. The State argued that the photographs were relevant in proving the *corpus delicti*; but the Court found that "the probative value of the photographs is outweighed by their tendency to inflame and prejudice the jury." *Id.* Importantly, the Court held that "the state could have shown the *angle and entry of the bullet wound* without the full-color, close-up view of the decomposed, maggot-infested skull." *Id.* (emphasis added).

6

¶10.    Exhibit 39 is a full-color, close-up, *frontal* photograph of Seabron's maggot-infested skull and facial area offered into evidence by the State, despite the fact that there was no dispute that Seabron had been shot in the *back* of the head. However, the State argued that, in one of Bonds's versions of the incident, Bonds had said that Seabron had shot himself in the back of the head when his arm was pinned behind his back. Therefore, the State contended, the angle of entry was important to disprove that version of events. The trial court admitted the photograph, observing that it showed part of a hairline fracture about which the forensic pathologist testified when describing Seabron's gunshot wound. The fracture ran from the entrance wound in the back of the head to the front of the skull. However, that fracture was plainly evident in Exhibit 36, a photograph of the side and rear of the head, which did not depict decaying flesh and maggot-infested eye sockets. The forensic pathologist testified about the crack when referring to this other, less prejudicial, photograph:

A:      . . . That fracture is going to extend to those sutures and also to the bone, and then goes to the front of the skull.

. . .

Q:      Is there anything other than the actual hole in the skull, is there any fractures or anything, indicated in this photograph?

A:      Just the defect [and] the fracture that is coming from the defect.

Q:      Okay. Are you saying that that is a natural defect or that – the part that I illuminated is a crack from the gunshot wound?

A:      It's a fracture or a crack from that entry defect.

¶11.    Exhibit 36 showed the crack from the entry wound, and the pathologist relied on that photograph to testify about the fracture. Although Exhibit 39 displayed the extent of the

7

crack to the front of the skull, the expert did not rely on that picture to testify about the angle of entry of the bullet. When asked about Exhibit 39, the expert stated:

> Basically, this is a front view of that skull and the fracture that I mentioned before that comes from the entry. Remember, it's on the right side. So it just come[s] to the side of the skull and also to the front. And you can see that linear fracture going through here that goes to the back.

¶12. The foregoing quotation constitutes the entirety of the prosecution's use of Exhibit 39. Exhibit 39 was not used to show the angle of entry. Two other photos, Exhibits 37 and 38, actually portrayed the section of the exterior front portion of the skull where the bullet impacted after it had passed through the brain from the entrance wound in the rear of the skull. Exhibit 36 showed the entrance wound. As in *McNeal*, here, "the state could have shown the angle and entry of the bullet wound without the full-color, close-up view of the decomposed, maggot infested skull." *Id.* Further, "the killing [wa]s not contradicted or denied, and the corpus delicti and the identity of the deceased [had] been established." *Le*, 913 So. 2d at 955.

¶13. At this point, we reach a dilemma. In addressing the admission of potentially prejudicial photographs in a criminal trial, this Court in *Le* stated:

> [The abuse of discretion] standard is very difficult to meet. In fact, the "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Brown v. State*, 690 So. 2d 276, 289 (Miss. 1996); *Holly v. State*, 671 So. 2d 32, 41 (Miss. 1996). "At this point in the development of our case law, no meaningful limits exist in the so-called balance of probative/prejudicial effect of photographs test." *Chase v. State*, 645 So. 2d 829, 849 (Miss. 1994) (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)).

8

*Le*, 913 So. 2d at 955-56 (¶ 158) (quoting *Stevenson v. State*, 733 So. 2d 177, 180 (Miss. 1998)). If that truly is the law, then we must affirm. However, we find that the language in *Le* and *Stevenson* goes too far. Meaningful limits must be placed on a trial judge's discretion to admit photographs, and those limits must be defined by weighing a photograph's probative evidentiary value against its prejudicial potential to arouse the passions of the jury. *See* M.R.E. 403. Although trial judges have wide discretion in admitting photographs, our powers of appellate review would mean little if that discretion truly was unlimited. Accordingly, today we overrule that line of cases which holds that trial judges have no meaningful limit on their discretion in admitting photographs at trial.[2] On appeal, this Court will give great deference to trial judges in the sound exercise of their discretion in the admission of photographs, but we are bound as an appellate court to determine whether such discretion has been abused by the admission of a photograph whose prejudicial effect far outweighs its probative value.

¶14.    This holding also will bring back into line this Court's criminal Rule 403 photograph jurisprudence with its civil counterpart. In civil cases, which do not involve the deprivation of life or liberty, this Court imposes an abuse of discretion standard on the trial court's admission of photographic evidence, but it never has held that the discretion "has no meaningful limits" or "runs toward almost unlimited admissibility." *See Eckman v. Moore*,

---

[2]We emphasize that this ruling does not overrule the general principle that trial judges have considerable discretion in ruling on the admissibility of photographs. Instead, this ruling clarifies that their *considerable* discretion is not *unlimited*. Allowing trial judges unlimited discretion to admit photographs would render appellate review irrelevant. We are simply reconciling our case law with the nature and purpose of the Mississippi Rules of Evidence, particularly Rule 403.

876 So. 2d 975, 984-85 (¶ 31) (Miss. 2004) ("We have held that the admission of evidence is well within the sound discretion of the trial court, subject to reversal on appeal *only if there be an abuse of that discretion*.") (citing **Ill. Cent. R.R. v. Gandy**, 750 So. 2d 527, 531 (Miss. 1999) (emphasis added)); *see also* **Miss. Transp. Comm'n v. Fires**, 693 So. 2d 917, 920 (Miss. 1997); **Terrain Enters., Inc. v. Mockbee**, 654 So. 2d 1122, 1128 (Miss. 1995). In **Eckman**, the Court reversed the trial court's decision to admit several photographs and videos of the decedent, as they were cumulative and highly prejudicial, clearly finding that the trial court had abused its discretion in admitting them and that the admission of photographs in civil cases did not run toward unlimited admissibility. **Eckman**, 876 So. 2d at 985-86 (¶¶ 33-37). Both civil and criminal cases follow the same rules of evidence, and the same standard of review and amount of discretion given a trial judge should apply. There is no rational reason for this Court to apply a more stringent application of our evidentiary rules to photographs in civil cases than we do in criminal cases.

¶15. Here, we are constrained to reverse. This Court has carefully examined Exhibit 39 and finds that it is gruesome in the extreme in its depiction of a rotting, maggot-infested, disfigured skull and face. The prejudicial effect of the admission of Exhibit 39 far outweighs any evidentiary value it had, in light of the multiple other items of evidence the State could have used–and much of which it did use–to demonstrate the angle of entry and internal path of the bullet. The fact that during *voir dire* examination each juror indicated that he or she would not be persuaded by disturbing photographs does not ameliorate the photograph's prejudicial impact's greatly outweighing its probative value. The dissent finds that the probative value of the photograph outweighs any prejudicial effect. We find the opposite.

10

The photograph was gruesome and cumulative and should not have been admitted. *McNeal* rightly established that the admission of such evidence is reversible error and infringes upon an accused's right to a fair trial. Accordingly, the trial court in the instant case abused its discretion when it admitted Exhibit 39.

## CONCLUSION

¶16. The close-up, full-color photograph of the shooting victim's rotting head was far more prejudicial than probative, and in light of the evidence at the State's disposal, had little, if any, evidentiary value. The State could have shown the angle of entry of the bullet without resorting to this graphic and gruesome depiction. In *McNeal*, this Court held that the introduction of "the full-color, close-up view of the decomposed, maggot infested skull," in light of alternative ways to display the angle of entry of the bullet, was reversible error. *McNeal*, 551 So. 2d at 159. In that respect, this case is indistinguishable from that exact situation. We also overrule any and all precedent to the effect that trial judges have no meaningful limits on their discretion to admit photographs at trial. While they do have wide discretion, there are meaningful limits, and they are defined by weighing the probative value of the photograph against its prejudicial effect and potential to inflame and arouse the passions of the jury. Accordingly, we reverse the decision of the Court of Appeals, reverse LeDarius Bonds's conviction and sentence, and remand his case to the Pike County Circuit Court for a new trial consistent with this opinion.

¶17. **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KING AND COLEMAN, JJ., CONCUR. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND CHANDLER, J.**

**PIERCE, JUSTICE, DISSENTING:**

¶18. I respectfully dissent from the majority's decision finding that the probative value of exhibit 39 was outweighed by its prejudicial effect.

¶19. In *McNeal v. State*, although this Court found that the photographs were inadmissible, this Court went on to state the following:

> In arriving at the finding above, we do not presume to conclude that every gruesome photograph admitted into evidence constitutes an abuse of discretion; however, when presented with photographs such as the ones in this case, we caution the trial judge to carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence. More specifically, the trial court must consider: (1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.

*McNeal v. State*, 551 So. 2d 151, 159-60 (Miss. 1989). This Court also stated, ". . . it is sufficient to say that these are some of the most gruesome photographs ever presented to this Court." *Id*. This Court stated that it would not describe every "morbid detail" of the photographs, but we do know that there were three photographs of a maggot-infested skull. *Id*. The case before us also involves the admission of a photograph depicting a maggot-infested skull, which is, without a doubt, unpleasant. However, it is not presently one of the most gruesome photographs that this Court has seen, regardless of its seemingly distinct similarities to the photograph in *McNeal*. *Id*.

¶20. For the sake of brevity, I will not include an exhaustive list of each time this Court has upheld the admissibility of unpleasant, and even gruesome, photographs. *McNeal v. State* is a rare occasion in which this Court found photographs to be more prejudicial than

probative, because this Court has stated that photographs should be admitted if they ". . . have evidentiary value when they aid in describing the circumstances of the killing, the location of the body, the cause of death, or clarify or supplement a witness's testimony." *Chamberlin v. State*, 989 So. 2d 320, 341 (Miss. 2008) (citing *Simmons v. State*, 805 So. 2d 452, 485 (Miss. 2001)). Here, the State used the photograph to disprove one of Bonds's stories, in which the victim had accidentally shot himself in the back of the head. It should also be noted that the trial court found two photographs to be inadmissible based on the defenses's offered stipulation as to the cause of death, which would have rendered their admission more prejudicial than probative.

¶21. Further, there is nothing to support that the photograph was a ploy on the part of the State. On the contrary, the record reveals that during *voir dire*, the State represented to the potential jurors that photographs would be presented that would depict the body after some time had passed, including ". . . severe decomposition, as well as some insect involvement. . . ." The State went on to instruct the potential jurors to raise their card if those photographs would affect their ability to decide the defendant's guilt or innocence based on *all* of the evidence or on whether the State proved its case beyond a reasonable doubt. The record reflects that no jurors indicated that they would be persuaded based solely on unpleasant photographs. The United States Court of Appeals for the Fifth Circuit determined that similar questioning to potential jurors, during *voir dire*, aided in limiting any prejudicial impact on the jury. *United States v. Collins*, 368 Fed. Appx. 517, 523, 81 Fed. R. Evid. Serv. 675 (5th Cir. 2010) (The court found the probative value of six photographs outweighed the prejudicial effect, even though they were "shocking and gruesome." The photographs

13

depicted the victim, as found at the crime scene and during autopsy, without a head and without hands).

¶22.    Accordingly, I would find that the probative value of the photograph outweighed any prejudicial effect, as it described the circumstances of the killing and the cause of death, and it also disproved one of Bonds's many versions of events. *Chamberlin*, 989 So. 2d at 341 (citing *Simmons*, 805 So. 2d at 485). Also, the photograph was referenced by the forensic pathologist, and the trial court sufficiently conducted a Rule 403 balancing test on the record. *Chamberlin*, 989 So. 2d at 341 (citing *Simmons*, 805 So. 2d at 485); Miss. R. Evid. 403. Lastly, I would find that any *potential* prejudicial effect was overcome by the State specifically addressing the issue during voir dire. *Collins*, 368 Fed. Appx. at 523.

**RANDOLPH, P.J., AND CHANDLER, J., JOIN THIS OPINION.**